**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

Plaintiff,

vs.

DAVID L. JOHNSON,

Defendant.

No. 09 Civ. 4826 (KMK)

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
## FOR A PRELIMINARY INJUNCTION

Evan R. Chesler
Stephen S. Madsen
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Plaintiff International Business
Machines Corporation*

## Table of Contents

Page

Table of Authorities ................................................................................................... ii

Introduction .................................................................................................................. 1

Statement of Facts ........................................................................................................ 2

    A.    IBM and Its Corporate Development Group ................................................ 2

    B.    Mr. Johnson ............................................................................................... 4

    C.    Mr. Johnson's Noncompetition Agreement ............................................. 6

    D.    Mr. Johnson's Decision to Retire From IBM and Join Dell .................. 8

Argument ....................................................................................................................... 9

I.    IBM Will Suffer Irreparable Injury Absent Injunctive Relief ................... 10

    A.    A Breach of the Noncompetition Covenants Will Cause IBM Irreparable Injury. ........................................................................................ 10

    B.    A Breach of the Nonsolicitation Covenants Will Cause IBM Irreparable Injury. ........................................................................................ 13

II.    IBM Is Likely to Prevail on the Merits. ......................................................... 14

    A.    The Covenants Are Reasonable. ................................................................ 15

    B.    The Noncompetition Covenants Protect Legitimate Interests of IBM. ... 17

III.    Alternatively, IBM Has Raised Sufficiently Serious Questions Going to the Merits, and the Balance of Hardships Decidedly Tips in IBM's Favor. .............. 18

Conclusion .................................................................................................................... 19

## Table of Authorities

Page(s)

**Cases**

*Alside Div. of Associated Materials Inc. v. Leclair,*
  743 N.Y.S.2d 898 (3d Dep't 2002) ....................................................................16

*Battenkill Veterinary Equine P.C. v. Cangelosi,*
  768 N.Y.S.2d 504 (3d Dep't 2003) ....................................................................16

*Biosynexus, Inc. v. Glaxo Group Ltd.,*
  No. 604485/2005, 2006 WL 624896 (N.Y. Sup. Ct. 2006) ..............................13

*Bus. Intelligence Servs. v. Hudson,*
  580 F. Supp. 1068 (S.D.N.Y. 1984) ..................................................................17

*CanWest Global Commc'ns Corp. v. Mirkaei Tikshoret Ltd.,*
  804 N.Y.S.2d 549 (N.Y.S. Ct. 2006) ................................................................13

*Estee Lauder Cos. v. Batra,*
  430 F. Supp. 2d 158 (S.D.N.Y. 2006) ...................................................... passim

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.,*
  730 F.2d 61 (2d Cir. 1984) (per curiam) ..........................................................11

*Global Switching Inc. v. Kasper,*
  No. 06-cv-412, 2006 WL 1800001 (E.D.N.Y. June 28, 2006) ..........................13

*Green Party of N.Y. v. N.Y. State Bd. of Elections,*
  389 F.3d 411 (2d Cir. 2004) ...............................................................................9

*International Business Machines Corp. v. Papermaster,*
  No. 08-cv-9078 (KMK), 2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008) ... passim

*N. Atl. Instruments, Inc. v. Haber,*
  188 F.3d 38 (2d Cir. 1999) .........................................................................11, 12

*Natsource LLC v. Paribello,*
  151 F. Supp. 2d 465 (S.D.N.Y. 2001) ..............................................................15

*Payment Alliance Int'l v. Ferreira,*
  530 F. Supp. 2d 477 (S.D.N.Y. 2007) ..............................................................16

*Pontone v. York Group, Inc.,*
  No. 08-cv-6314, 2008 WL 4539488 (S.D.N.Y. Oct. 10, 2008) ........................16

*Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.,*
  118 F.3d 955 (2d Cir. 1997) ..............................................................................11

## Table of Authorities, con't.

Page(s)

*Ticor Title Ins. Co. v. Cohen,*
    173 F.3d 63 (2d Cir. 1999) ...........................................................................................11, 15

*Urban Archaeology Ltd. v. Dencorp Invs., Inc.,*
    783 N.Y.S.2d 330 (1st Dep't 2004)...................................................................................14

*Willis of New York, Inc. v. DeFelice,*
    750 N.Y.S.2d 39 (N.Y. App. Div. 2002) ..........................................................................12

*Zerman v. Ball,*
    735 F.2d 15 (2d Cir. 1984) ...............................................................................................11

**Statutes & Rules**

Fed. R. Civ. P. 65 ....................................................................................................................1

**Other Authorities**

17A C.J.S. Contract § 266 .....................................................................................................16

- iii -

Pursuant to Federal Rule of Civil Procedure 65, plaintiff International Business Machines Corporation ("IBM" or "the Company") respectfully submits this memorandum of law in support of its motion for a preliminary injunction.

### Introduction

On May 19, 2009, David L. Johnson, IBM's Vice President of Corporate Development, announced that he intended to retire from IBM effective June 1, 2009, to take a position as Senior Vice President of strategy at Dell Inc. ("Dell"). In his position at IBM, Mr. Johnson has been responsible for the development and implementation of business strategy for all of IBM's business units. In particular, and among other things, he has been responsible for IBM's strategic acquisitions and divestitures, as well as for the integration of acquired firms. He has full knowledge of IBM strategic initiatives, including initiatives relating to IBM's servers and storage businesses, that are highly confidential even within IBM—indeed, that are known only to IBM's most senior personnel.

Dell is a significant competitor of IBM in the areas of servers and storage. There is, and can be, no question about that—Dell identifies IBM as a significant competitor in its annual report on Form 10-K, and IBM so identifies Dell in its own filing. Mr. Johnson's stated intention to take employment with Dell threatens IBM with irreparable harm, for Mr. Johnson could not possibly counsel Dell on development of its business strategy without using and divulging his vast knowledge of IBM business strategy.

Mr. Johnson is a party to a Noncompetition Agreement with IBM by which he agreed not to take a position with an IBM competitor for a period of twelve months following termination of his employment with IBM. In *International Business Machines Corp. v. Papermaster*, No. 08-CV-9078 (KMK), 2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008) ("*IBM v. Papermaster*"), this Court found that agreement to be reasonable both in scope and limitation as to another senior

- 1 -

IBM executive, whom it preliminarily enjoined from taking a position with another IBM competitor, and those restrictions are equally reasonable as to Mr. Johnson.  IBM has urged Mr. Johnson to reconsider his decision to commence employment with Dell and has reminded him of the covenants contained in his Noncompetition Agreement.  Mr. Johnson has declined to reconsider his decision.

In light of Mr. Johnson's decision to leave IBM for Dell, IBM filed this lawsuit to enforce the Noncompetition Agreement and to protect its trade secrets and other confidential information.  The trade secrets and confidential information in Mr. Johnson's possession will remain sensitive and valuable for substantially longer than the twelve-month period of the noncompetition covenant.  IBM now seeks a preliminary injunction compelling Mr. Johnson to honor his contractual obligations, and reserves its right to seek at trial a permanent injunction for a longer period tailored to protect its trade secrets and other confidential information from use or disclosure.

### Statement of Facts

A detailed statement of the facts material to IBM's motion is set forth in the accompanying declarations of Mark Loughridge dated May 26, 2009 ("Loughridge Decl.") and J. Randall MacDonald dated May 26, 2009 ("MacDonald Decl.").  For the Court's convenience, the key facts are set forth below.

### A.      IBM and Its Corporate Development Group

IBM is one of the world's largest technology companies, employing approximately 400,000 people around the world.  IBM is a globally integrated enterprise that targets the intersection of technology and effective business.  (Loughridge Decl. ¶ 3.)

In recent years, acquisitions and divestitures have been crucial to IBM's competitive strategy and financial performance.  By acquiring certain businesses and divesting

- 2 -

others, IBM has transformed its business, effecting significant increases in its margins, earnings and free cash flow.  In the last five years alone, IBM has made 56 acquisitions that have significantly increased IBM revenue and profit growth, optimized performance and enabled IBM to offer superior products.  (*Id.* ¶ 6.)

IBM's acquisitions and divestitures are handled by its Corporate Development group, which Mr. Johnson leads.  That group is responsible for identifying potential transactions, evaluating transaction structures and economics, negotiating terms, overseeing transaction documentation and ensuring timely consummation.  (*Id.* ¶ 7.)  In addition, the Corporate Development group is responsible for the crucial task of integrating acquired firms into IBM.  The ability to integrate an acquired company is key to a successful acquisition, and IBM's Integration team, a separate group within Corporate Development that also reports to Mr. Johnson, is renowned for its integration skills.  The Integration team relies upon confidential and proprietary practices and information concerning, for example, assessment of organizational structure and of individual performance and potential.  (*Id.* ¶ 9.)

Until a transaction is announced, the activities of the Corporate Development group are, necessarily, secret even within IBM.  Premature disclosure of a contemplated acquisition or divestiture can easily disrupt a proposed transaction and interfere with, or prevent altogether, its successful completion.  Moreover, identifying and evaluating IBM's future business and strategic needs, and then identifying, evaluating and preparing to carry out transactions that will meet those needs, requires in-depth knowledge of all of IBM's technological initiatives, its market assessments, its competitive strategies and its marketing plans, all of which are highly confidential even within IBM.  Thus, the Corporate Development group is privy to IBM's most crucial—and most carefully guarded—confidential information. (*Id.* ¶ 12.)

- 3 -

B.     **Mr. Johnson**

Mr. Johnson has been with IBM for over 27 years. He currently holds the position of Vice President of Corporate Development, and for the past nine years directed the Company's mergers, acquisitions and divestiture strategy as head of the Corporate Development group. (Loughridge Decl. ¶¶4-5; MacDonald Decl. ¶ 4.)  By virtue of his responsibilities in that position, Mr. Johnson is aware of IBM's past, present and future business strategies and its competitive strengths and weaknesses.  He knows about all of the acquisitions and transactions that IBM is considering, as well as what IBM units are under consideration for divestiture.  He knows in which areas, companies and technologies IBM will invest, at what times, and with what expected rates of return, as well as information regarding potential divestitures. (Loughridge Decl. ¶ 8.)  In addition, as head of the Corporate Development group, Mr. Johnson has followed a practice of communicating regularly with the Company's development engineers and researchers to discuss new projects and future plans, thereby creating a network of all of the significant participants in the development of IBM's business strategy and its technological innovation.  (*Id.* ¶ 10.)

IBM is a global enterprise.  (Krzyzowski Decl. Ex. 2, IBM 2009 10-K, at 6-7.)  Mr. Johnson's responsibilities are likewise global in scope, and he has been responsible for transactions involving companies in various countries worldwide, including, for example, Canada, China and Israel.  (Loughridge Decl. ¶ 7.)

The confidential and strategic business information in Mr. Johnson's possession is carefully safeguarded and is not made accessible to the public, to IBM's competitors, or even to most IBM employees.  IBM's competitors cannot replicate from public sources the highly confidential information Mr. Johnson has learned over his career at IBM.  (*Id.* ¶ 12.)

In addition, Mr. Johnson has served, since 2006, as a member of IBM's Integration & Values Team ("I&VT"). The I&VT consists of approximately 300 top executives who IBM believes are its key business leaders. I&VT members are made aware of the most difficult and important strategic and competitive issues facing IBM and are exposed to and work with the most sensitive strategic information the company possesses. (MacDonald Decl. ¶ 6.) I&VT members also participate extensively in programs that are designed to expose them to highly confidential aspects of IBM's business with which they would not otherwise be familiar based on their primary job responsibilities, with a view to broadening their understanding of the company and the most important issues, strategic choices and competitive challenges it faces. (*Id.* ¶ 8.) For example, I&VT members, including Mr. Johnson, are exposed to highly confidential information related to the development status of specific IBM products, as well as extensive confidential assessments of the competitive landscape of the industries in which IBM participates. (*Id.* ¶ 9.)

Given the highly confidential nature of the information to which I&VT members are exposed, and the fact that members of the I&VT are the senior executives who manage IBM's business and set its strategy, all members of the I&VT are asked to execute a Noncompetition Agreement. (*Id.* ¶ 10.) The information Mr. Johnson possesses as a member of the I&VT represents IBM's extraordinary investment in research and innovation and is critical to IBM's competitive success; indeed, IBM has built its business around such highly confidential information. Consequently, that information is carefully safeguarded and is not made accessible to the public, to IBM's competitors, or even to most IBM employees. IBM's competitors could not replicate from public sources the information Mr. Johnson possesses as a member of the I&VT. (*Id.* ¶ 11.)

- 5 -

Mr. Johnson also serves as a member of the Strategy Team, a small group consisting of approximately 15 members selected from the most senior executives of the Company. The strategy team serves as a forum for discussing the most sensitive and significant strategic concerns of the Company. The issues considered by the Strategy Team include every aspect of IBM's business, not only acquisition and divestiture activity. As a member of the Strategy Team, Mr. Johnson has gained insight into highly confidential information regarding, for example, yet-to-be-introduced products and "go-to-market" strategies. Such information is carefully safeguarded by IBM, not made accessible to the public, to IBM's competitors, or even to most IBM employees. IBM's competitors could not replicate from public sources the information Mr. Johnson possesses as a member of the Strategy Team. (*Id.* ¶ 5.)

In short, Mr. Johnson possesses substantially all of IBM's most valuable trade secrets and other proprietary information concerning its business strategies and future plans. Moreover, the confidential information and trade secrets in Mr. Johnson's possession will be valuable for a long time, and significantly longer than 12 months. (MacDonald Decl. ¶ 11; Loughridge Decl. ¶ 13.)

### C.    Mr. Johnson's Noncompetition Agreement

In 2005, in connection with his employment at IBM and his acceptance of certain equity grants, Mr. Johnson agreed to the Noncompetition Agreement. (MacDonald Decl. ¶ 4.) In that agreement, Mr. Johnson agreed that

> "during [his] employment with IBM and for one (1) year
> following the termination of [his] employment . . . . [he] will not
> directly or indirectly within the 'Restricted Area' (i) 'Engage in or
> Associate with' (a) any 'Business Enterprise' or (b) any significant
> competitor or major competitor of the Company".

(Krzyzowski Decl. Ex. 1, Noncompetition Agreement § 1(b).)  In the Noncompetition Agreement, "Restricted Area" is defined as "any geographic area in the world for which you

- 6 -

had job responsibilities during the last twelve (12) months of your employment with the

Company". (*Id.* § 2(d).) The term "Engage in or Associate with" is defined to include

"engagement or association as . . . [an] associate, employee, member, consultant, contractor or

otherwise". (*Id.* § 2(c).) Finally, "Business Enterprise" is defined as "any entity that engages

in . . . competition with the business units or divisions of the Company in which you worked at

any time during the two (2) year period prior to the termination of your employment". (*Id.*

§ 2(a).)

    Mr. Johnson also agreed to nonsolicitation covenants, more specifically that

> "during [his] employment with IBM and for one (1) year
> following the termination of [his] employment . . . . [he] will not
> directly or indirectly within the 'Restricted Area' . . . solicit, for
> competitive business purposes, any customer of the Company
> with which [he was] involved as part of [his] job responsibilities
> during the last twelve (12) months of [his] employment with the
> Company."; and

> "for the two (2) year period following the termination of [his]
> employment . . . [he] will not directly or indirectly within the
> 'Restricted Area,' hire, solicit or make an offer to any employee of
> the Company to be employed or perform services outside of the
> Company".

(*Id.* § 1(b).)

    Additionally, in the Noncompetition Agreement, Mr. Johnson made several

important acknowledgments. Among others, Mr. Johnson expressly acknowledged that:

> "[T]he business in which IBM and its affiliates . . . are engaged is
> intensely competitive". (*Id.* § 1(a).)

> "[His] employment by IBM has required, and will continue to
> require, that [he] have access to, and knowledge of, confidential
> information of the Company, including, but not limited to, certain
> or all of the Company's methods, information, systems, plans for
> acquisition or disposition of products, expansion plans, financial
> status and plans, customer lists, client data, personnel information
> and trade secrets of the Company, all of which are of vital
> importance to the success of the Company's business". (*Id.*)

"[His] services to the Company are, and will continue to be, extraordinary, special and unique". (*Id.*)

"[T]he Company would suffer *irreparable harm* if [he failed] to comply with [the noncompetition and the nonsolicitation covenants]". (*Id.* § 3 (emphasis added).)

"[T]he restrictions set forth in [the covenants] are reasonable as to geography, duration and scope". (*Id.*)

Mr. Johnson has repeatedly confirmed his agreement with the terms of the Noncompetition Agreement by accepting additional equity grants, which are conditioned on such acceptance. (MacDonald Decl. ¶ 4.)

**D.      Mr. Johnson's Decision to Retire From IBM and Join Dell**

On May 19, 2009, Mr. Johnson informed IBM that he had decided to retire from the Company effective June 1, 2009 and assume a senior strategy position with Dell. (Loughridge Decl. ¶ 14; MacDonald Decl. ¶¶ 12-14.)  Based on the limited information Mr. Johnson shared with IBM, Mr. Johnson will report directly to Dell Chairman and CEO Michael Dell, and his strategy responsibilities will be global in nature, as they have been at IBM. (*Id.*)

Dell is a significant competitor of IBM in the world of high technology. (MacDonald Decl. ¶ 17; Loughridge Decl. ¶¶ 15–16.)  In particular, IBM and Dell compete heavily in the area of enterprise servers and storage.  IBM identified Dell in its 2009 10-K as a "principal competitor" in this area. (Krzyzowski Decl. Ex. 2, IBM 2009 10-K, at 6–7.)  Dell identified IBM in an exhibit to its 2009 10-K as a "Direct Competitor". (Krzyzowski Decl. Ex. 3, Ex. 10.21 to Dell 2009 10-K, at 3.)  Indeed, Dell's website compares its servers with IBM servers and features a graphic with the quote "HP and IBM should be very afraid . . . ". (Krzyzowski Decl. Ex. 5, "Dell PowerEdge Servers".)  IBM's website includes comparisons with Dell servers, including a page entitled "Migrate from Dell". (Krzyzowski Decl. Ex. 4, "Migrate From Dell".)

On May 20, 2009, IBM reminded Mr. Johnson of the Noncompetition Agreement and informed him that IBM would seek to enforce the agreement if he attempted to join Dell. (MacDonald Decl. ¶ 15.) IBM also encouraged Mr. Johnson to reconsider his decision and remain with the Company. (*Id.*)

On May 25, 2009, Mr. Johnson informed IBM that he would proceed with his plan to retire from IBM, as is his right. On May 26, 2009, he informed IBM that his start date with Dell was yet to be determined. (*Id.* ¶ 16.) On May 28, 2009, Dell's Senior Vice President for Human Resources advised Mr. MacDonald of IBM that Dell hoped Mr. Johnson would start in "the middle of June". (Supplemental Declaration of J. Randall MacDonald, dated June 1, 2009, ¶ 2.) On the evening of May 31, 2009, after multiple exchanges in which it was asserted that Mr. Johnson's start date had not yet been determined, counsel for Mr. Johnson informed counsel for IBM that Mr. Johnson's start date would be June 2, 2009. (Declaration of Stephen S. Madsen, dated June 1, 2009, ¶¶ 7-10.)

IBM now seeks a preliminary injunction to enforce the Noncompetition Agreement.

## Argument

Before a court may issue a preliminary injunction, the movant must show (1) that it will suffer irreparable injury absent such relief; and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in movant's favor. *Green Party of N.Y. v. N.Y. State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir. 2004); *Estee Lauder Cos. v. Batra*, 430 F. Supp. 2d 158, 170 (S.D.N.Y. 2006) (internal citations omitted).

In *IBM v. Papermaster*, this Court entered a preliminary injunction against another senior IBM executive who sought to take employment with one of IBM's competitors and who

had entered into a Noncompetition Agreement that was essentially the same as Mr. Johnson's. *IBM v. Papermaster*, 2008 WL 4974508, at *1, 3.  In *IBM v. Papermaster*, this Court determined that IBM had shown a likelihood of success on the merits, finding that the Noncompetition Agreement, which (like Mr. Johnson's) imposed a one-year, worldwide restriction on employment with a competitor, was "reasonable in duration and geographic scope".  *Id.* at *13. This Court also found that the employee had been "inculcated with some of IBM's most sensitive and closely-guarded technical and strategic secrets", 2008 WL 4974508, at *8, and that IBM had shown irreparable harm because, among other things, it was "inconceivable" that the employee could perform the functions for which the competitor had hired him without using his extensive knowledge of IBM's confidential information.  *Id.* at *10.

## I.     IBM Will Suffer Irreparable Injury Absent Injunctive Relief.

Mr. Johnson's imminent breach of the Noncompetition Agreement will cause IBM irreparable harm.

### A.     A Breach of the Noncompetition Covenants Will Cause IBM Irreparable Injury.

In the Noncompetition Agreement, Mr. Johnson acknowledged, among other things, that

> "[his] employment by IBM has required, and will continue to require, that [Mr. Johnson] have access to, and knowledge of, confidential information of the Company, including, but not limited to, certain or all of the Company's methods, information, systems, plans for acquisition or disposition of products, expansion plans, financial status and plans, customer lists, client data, personnel information and trade secrets of the Company, all of which are of vital importance to the success of the Company's business".

(Krzyzowski Decl. Ex. 1, Noncompetition Agreement § 1(a).)  Mr. Johnson further acknowledged that IBM would "suffer *irreparable harm*" if he failed to comply with the

Noncompetition Agreement. (*Id.* § 3 (emphasis added).) Those important acknowledgments in the agreement Mr. Johnson is seeking to breach are entitled to significant weight, and fully support an award of injunctive relief. *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999); *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44-45 (2d Cir. 1999); *IBM v. Papermaster*, 2008 WL 4974508, at *9.

      In addition, where, as here, the plaintiff faces a danger of trade secret misappropriation, irreparable harm—the type of harm that cannot be remedied by a money damages award—may be properly presumed.[1] *Estee Lauder*, 430 F. Supp. 2d at 174. That is because "a trade secret once lost is, of course, lost forever", and such a loss "cannot be measured in money damages". *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (per curiam); *see also Estee Lauder*, 430 F. Supp. 2d at 174 (explaining that if plaintiff's competitor "does misappropriate [plaintiff's] trade secrets, it would be 'very difficult to calculate the monetary damages that would successfully redress the loss'" (quoting *Ticor Title Ins.*, 173 F.3d at 68-69)).

      Mr. Johnson is in possession of IBM's confidential information and trade secrets. New York law recognizes that "any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner of such secrets] an opportunity to obtain an advantage over competitors who do not know or use it", may qualify as a trade secret or otherwise be entitled to protection. *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997) (internal citation omitted). Generally, New York courts consider several

---

[1] The Noncompetition Agreement contains a choice of law clause, which provides that the agreement "shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to its conflict of law rules". (Krzyzowski Decl. Ex. 1, Noncompetition Agreement § 13.) Because IBM is a New York corporation whose global headquarters are also located in the State of New York, that choice of law provision should be enforced. *See Zerman v. Ball*, 735 F.2d 15, 20 (2d Cir. 1984).

factors in determining whether information constitutes a trade secret, including: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *N. Atl. Instruments*, 188 F.3d at 44 (internal citation omitted).

Much of the confidential information in Mr. Johnson's possession, the disclosure of which IBM seeks to prevent, bears the hallmarks of a trade secret. That information is not known outside of IBM's business. (Loughridge Decl. ¶ 12.) Even within IBM, sensitive information with which Mr. Johnson is familiar through his responsibilities as well as his membership on the Strategy Team and I&VT, regarding, for example, yet-to-be-introduced products and sensitive acquisition and integration practices, are not extensively disseminated, and are disclosed only on a need-to-know basis. (MacDonald ¶¶ 5, 8, 9, 11; Loughridge Decl. ¶¶ 12.) Such information is highly valuable to IBM, and perhaps even more so to the companies with which IBM competes. (Loughridge Decl. ¶ 12, 16; MacDonald Decl. ¶¶ 4, 5, 11, 17.) IBM expends significant resources in developing the proprietary practices and information Mr. Johnson has access to. (Loughridge Decl. ¶ 12; MacDonald Decl. ¶¶ 11, 17.) IBM's competitors could not replicate the information at issue from public sources. (Loughridge Decl. ¶ 12; MacDonald Decl. ¶¶ 5, 11.)

Even in the absence of trade secrets, an employer may be irreparably harmed where "high-level . . . employees with access to confidential information . . . could . . . easily utilize[]" such information in their new positions. *See Willis of New York, Inc. v. DeFelice*, 750 N.Y.S.2d 39, 42 (1st Dept. 2002). A "substantial risk of irreparable injury" arises from the fact

- 12 -

that "[s]hould the information be improperly disclosed . . . it would be impossible to once again make it confidential." *Biosynexus, Inc. v. Glaxo Group Ltd.*, No. 604485/2005, 2006 WL 624896, at *7 (N.Y. Sup. Ct. 2006).

Mr. Johnson's planned employment with Dell will cause IBM irreparable harm. In carrying out his strategy responsibilities with Dell, Mr. Johnson will necessarily rely upon his extensive knowledge of the strengths, weaknesses, strategic assessments and future plans of one of Dell's chief competitors — IBM. As this Court stated in *IBM v. Papermaster*, "the likely inevitability of even inadvertent disclosure is sufficient to establish a real risk of irreparable harm to IBM", especially where, as is the case with Mr. Johnson, the employee has spent substantially his entire career at IBM and has no other knowledge base to "draw upon to perform his new and important job". 2008 WL 4974508, at *10. Once IBM's most competitively sensitive information is in the possession of Dell, it cannot be "taken back". The harm would be irreparable.

**B.      A Breach of the Nonsolicitation Covenants Will Cause IBM Irreparable Injury.**

While Mr. Johnson will suffer no harm from his performance of the nonsolicitation covenants, a breach of those covenants will undoubtedly cause IBM irreparable injury. As New York courts have recognized, "[g]enerally, when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm". *Global Switching Inc. v. Kasper*, No. 06-cv-412, 2006 WL 1800001, at *12 (E.D.N.Y. June 28, 2006) (internal citation omitted).

Similarly, "the violation of a non-compete by the solicitation of employees . . . constitutes irreparable harm". *Id. See also CanWest Global Commc'ns Corp. v. Mirkaei Tikshoret Ltd.*, 804 N.Y.S.2d 549, 562 (N.Y.S. Ct. 2005) ("[t]he loss of key employees constitutes irreparable

harm as a matter of law"); *Urban Archaeology Ltd. v. Dencorp Invs., Inc.*, 783 N.Y.S.2d 330, 336 (1st Dep't 2004).

This is a particular concern here. Through his 27 years of employment with IBM, and in particular over his 9 years directing the Corporate Development group, Mr. Johnson has formed business relationships with numerous individuals who are in possession of competitively sensitive IBM information and who Mr. Johnson could seek to recruit in an effort to establish an organization of similar quality to support him at Dell. Some of these IBM employees could be recruited from the Corporate Development and Integration teams, while others are located across the various IBM businesses with which Mr. Johnson interacted over the course of his career at IBM.

Finally, as noted, Mr. Johnson has already acknowledged that a breach of the Noncompetition Agreement will cause IBM irreparable harm. (Krzyzowski Decl. Ex. 1, Noncompetition Agreement § 3.)

## II.     IBM Is Likely to Prevail on the Merits.

IBM is also highly likely to prevail on the merits of its claims for specific performance of the Noncompetition Agreement.[2]

---

[2] IBM rests its request for a preliminary injunction primarily on its claim for breach of Mr. Johnson's Noncompetition agreement. IBM has also sued Mr. Johnson for misappropriation of trade secrets, however. Although Mr. Johnson has not yet commenced work at Dell and so presumably has not yet used or disclosed any of IBM's proprietary information for Dell's benefit, IBM believes that Mr. Johnson could not perform the duties of the position for which Dell has hired him without making improper use or disclosure of such information. IBM reserves the right at trial of this action to seek relief based on its misappropriation claim as well as its breach of contract claim and to seek a permanent injunction of duration longer than the one year period specified in the Noncompetition Agreement tailored to address the fact that a substantial portion of the proprietary information in Mr. Johnson's possession will remain secret—and highly valuable—for a period longer than just one year.

Under New York law, an employer seeking to enforce an agreement that restricts an employee's future activities must prove that the agreement in question is reasonable with respect to duration and geographical area. *Ticor Title Ins.*, 173 F.3d at 69. Where the agreement includes a noncompetition covenant, the plaintiff must also show that enforcement of it is necessary either to (1) prevent an ex-employee from disclosing trade secrets or confidential information to the employer's competitors or (2) to stop an employee with special, unique, or extraordinary skills from working for a competitor to the detriment of the initial employer. *Id.* at 70; *see also Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 470 (S.D.N.Y. 2001). In determining whether a restrictive covenant is reasonable, the court "must weigh the need to protect the employer's legitimate business interests against the employee's concern regarding the possible loss of livelihood". *Ticor Title Ins.*, 173 F.3d at 69.

As set forth below, the Noncompetition Agreement is fully enforceable because its covenants are reasonable in scope and serve to protect vital interests of IBM, while their performance imposes no meaningful hardship on Mr. Johnson. As this Court stated in *IBM v. Papermaster*, the temporal restriction in the Noncompetition Agreement "is 'very limited in time'" and "the nature of IBM's business 'requires that the restriction be unlimited in geographic scope'". 2008 WL 4974508, at *11 (quoting *Natsource, LLC v. Paribello*, 151 F. Supp. 2d at 471-72).

A.      **The Covenants Are Reasonable.**

Under New York law, "there are no per se lines demarcating what constitutes an unreasonable durational or geographic scope". *Estee Lauder*, 430 F. Supp. 2d at 180.

The "durational reasonableness of a non-compete agreement is judged by the length of time for which the employer's confidential information will be competitively valuable". *Id.* As explained in the MacDonald and Loughridge declarations, the confidential

- 15 -

information and trade secrets that Mr. Johnson has in his possession are extensive, and the value of such information extends far beyond the one-year duration of the noncompetition covenants. (Loughridge Decl. ¶ 13; MacDonald Decl. ¶ 11.)  For that reason, the duration of the noncompetition covenants (12 months) is reasonable.  The duration of the client nonsolicitation covenant (12 months) is similarly reasonable, because IBM will need a substantial amount of time to groom a new business executive to assume Mr. Johnson's responsibilities.  Finally, given the irreparable hardship that would be inflicted upon IBM by additional defections of extraordinary talent (MacDonald Decl. ¶ 17; Loughridge Decl. ¶ 17), the duration of the employee nonsolicitation covenant (24 months) is reasonable as well.  Notably, duration restrictions of between one and three years have routinely been upheld as reasonable.  *E.g.*, *IBM v. Papermaster*, 2008 WL 4974508, at *11-13; *Payment Alliance Int'l*, 530 F. Supp. 2d 477, 485 (S.D.N.Y. 2007) (upholding 2-year covenant); *Alside Div. of Associated Materials Inc. v. Leclair*, 743 N.Y.S.2d 898, 898-99 (3d Dep't 2002) (upholding 2-year covenant); *Battenkill Veterinary Equine P.C. v. Cangelosi*, 768 N.Y.S.2d 504, 505-06 (3d Dep't 2003) (upholding 3-year covenant); *Pontone v. York Group, Inc.*, No. 08-cv-6314, 2008 WL 4539488, at *5 (S.D.N.Y. Oct. 10, 2008) (upholding 3-year covenant in the context of a sale of a business).

The geographical restrictions of the covenants, which preclude Mr. Johnson from working for a competitor or soliciting clients within "any geographic area in the world for which [he] had job responsibilities during the last twelve (12) months of [his] employment" (Krzyzowski Decl. Ex. 1, Noncompetition Agreement § 2(d)), are reasonable as well.  It is well established that "[a]rea limitations are reasonable if restricted to the area in which the employee was engaged in the course of his or her employment".  17A C.J.S. Contract § 266.  Where warranted by the nature and scope of the employer's business, broad geographical limitations, even worldwide, have been deemed reasonable. *Estee Lauder*, 430 F. Supp. 2d at 181 (upholding

worldwide limitation); *Bus. Intelligence Servs. v. Hudson*, 580 F. Supp. 1068, 1073 (S.D.N.Y. 1984) (upholding worldwide limitation).  As this Court stated in *IBM v. Papermaster*, "IBM's business requires that the restriction be unlimited in geographic scope".  *IBM v. Papermaster*, 2008 WL 4974508, at *11 (internal citation omitted).  Particularly where, as here, the employee's responsibilities have been global in scope, a global restriction is both necessary and appropriate.

The balance struck in the Noncompetition Agreement between IBM's interest in protecting its confidential information and trade secrets and Mr. Johnson's right to pursue employment opportunities of his choosing is also reasonable.  On the one hand, the disclosure of IBM confidential information and trade secrets will cause IBM irreparable harm, as will the potential loss of valuable employees and clients.  (*See supra* Section I.)  On the other hand, if he is ordered to comply with the terms of the Noncompetition Agreement, Mr. Johnson will suffer no substantial hardship.  His performance of the nonsolicitation covenants will cause Mr. Johnson no conceivable harm.  Compliance with the noncompetition covenants similarly causes no hardship to Mr. Johnson because, over the course of his 27-year career at IBM, Mr. Johnson has received substantial compensation and, during the one-year term of the noncompetition covenant, he will be eligible to receive substantial compensation in connection with his retirement from the Company.  (MacDonald Decl. ¶ 18.)

Accordingly, the covenants set forth in the Noncompetition Agreement are reasonable, as Mr. Johnson acknowledged in that agreement.  (Krzyzowski Decl. Ex. 1, Noncompetition Agreement § 3 ("[T]he restrictions set forth in Paragraph 1 are reasonable as to geography, duration and scope").)

## B.   The Noncompetition Covenants Protect Legitimate Interests of IBM.

As set forth above, enforcement of the covenants is needed because there is a real danger that IBM's confidential information and trade secrets will be exposed to a competitor.

(*See supra* Section I.)  Furthermore, Mr. Johnson's 27-year career at IBM and his membership in

the Strategy Team and the I&VT have conferred upon him unique or special experience

(Loughridge Decl. ¶¶ 5, 8, 10, 11, 12 ), as Mr. Johnson acknowledged in the Noncompetition

Agreement, (Krzyzowski Decl. Ex. 1, Noncompetition Agreement § 1(a)(iv) ("[B]y your training,

experience and expertise, your services to the Company are, and will continue to be,

extraordinary, special and unique").)

*        *        *

In sum, IBM has established that it is likely to prevail on the merits of its claims

for specific performance of the Noncompetition Agreement.

**III.    Alternatively, IBM Has Raised Sufficiently Serious Questions Going to the Merits, and the Balance of Hardships Decidedly Tips in IBM's Favor.**

As set forth above, IBM has demonstrated that it is entitled to an order

preliminarily enjoining Mr. Johnson from violating the terms of the Noncompetition Agreement

because (1) breach thereof will cause IBM irreparable harm; and (2) IBM is likely to prevail on

the merits of its claim for specific performance.

Even if the Court were not satisfied that IBM is likely to prevail on the merits,

IBM has at a minimum raised sufficiently serious questions going to the merits of the dispute.

Because there is no question that the balance of hardships tips decidedly in IBM's favor (*see*

*supra* at 14-15, 17-18), preliminary injunctive relief is appropriate.  *See Estee Lauder,* 430 F. Supp.

2d at 182 (internal citation omitted).

## Conclusion

For the reasons set forth above, IBM respectfully requests that the Court issue a preliminary injunction enforcing the Noncompetition Agreement.

June 1, 2009

CRAVATH, SWAINE & MOORE LLP

By

Evan R. Chesler
(EChesler@Cravath.com)
Stephen S. Madsen
(SMadsen@Cravath.com)
Members of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Plaintiff International Business Machines Corporation*