**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____
                                        :
**INTERNATIONAL BUSINESS**              :
**MACHINES CORPORATION,**               :
                                        :
                    Plaintiff,          :        **09-CV-4826 (SCR)**
                                        :
        v.                              :
                                        :
**DAVID L. JOHNSON,**                   :
                                        :
                    Defendant.          :
_____:


**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO INTERNATIONAL**
**BUSINESS MACHINES CORPORATION'S MOTION FOR A PRELIMINARY**
**INJUNCTION**


                              Schulte Roth & Zabel LLP
                              919 Third Avenue
                              New York, New York 10022
                              (212) 756-2000 (telephone)
                              (212) 593-5955 (facsimile)

                              Ronald E. Richman
                              Holly H. Weiss
                              Sara Solfanelli


                              Morgan, Lewis & Bockius LLP
                              1701 Market Street
                              Philadelphia, PA  19103
                              (215) 963-5000 (telephone)
                              (215) 963-5001 (telephone

                              Michael L. Banks
                              Michael S. Burkhardt

                              *Attorneys for Defendant*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

COUNTERSTATEMENT OF FACTS ................................................................... 2

    A.    Mr. Johnson's Employment at IBM ......................................... 2

    B.    Mr. Johnson's Alleged Exposure to Confidential Information ................. 2

    C.    The Purported Noncompetition Agreement ................................. 4

    D.    Mr. Johnson's Equity Awards ................................................ 7

    E.    Mr. Johnson's Opportunity at Dell ......................................... 7

    F.    Mr. Johnson's Resignation and Efforts to Confer With IBM .............. 9

    G.    Mr. Johnson's Hardship If He Is Barred From Working for Dell ........... 10

ARGUMENT ................................................................................................. 10

    I.    PLAINTIFF BEARS THE BURDEN OF PROVING CIRCUMSTANCES
        WARRANTING A PRELIMINARY INJUNCTION ........................... 11

    A.    Plaintiff Cannot Prove A "Clear" Or "Substantial" Likelihood of
        Success. .......................................................................... 12

        1.    To form an enforceable contract, New York law
            requires mutual assent and intent to be bound,
            including valid execution ................................. 13

        2.    The "Agreement" and its surrounding circumstances
            do not evidence the unambiguous intent on behalf
            of the parties to form an enforceable contract ................. 14

    B.    IBM Has Not Shown that the Balance of Hardships is Decidedly in
        its Favor ......................................................................... 19

    C.    Plaintiff Cannot Demonstrate That it Will be Irreparably Harmed
        Absent an Injunction Because it Cannot Prove a Legitimate
        Protectable Interest .......................................................... 20

        1.    The Alleged Agreement Does Not Protect Plaintiff's
            Legitimate Protectable Interests ....................... 20

        2.    Plaintiff Cannot Establish Irreparable Harm Based
            on the Inevitable Disclosure Doctrine .......................... 24

        3.    Plaintiff Cannot Rely on an Acknowledgment in the
            Alleged Contract to Establish Irreparable Harm .............. 28

CONCLUSION ................................................................................................. 30

i

## <u>TABLE OF AUTHORITIES</u>

*AM Medica Commc'ns Group v. Kilgallen*,
261 F. Supp. 2d 258 (S.D.N.Y. 2003).....................................................................................20

*Am. Broad. Cos. v. Wolf*,
52 N.Y.2d 394 (1981) ...............................................................................................11, 14

*Am. Fed. Group, Ltd. v. Rothenberg*,
136 F.3d 897 (2d Cir. 1998)...................................................................................................14

*Am. Inst. of Chem. Eng'rs v. Reber-Friel Co.*,
682 F.2d 382 (2d Cir. 1982)...............................................................................11, 19, 20, 21

*In re Am. Preferred Prescription, Inc.*,
186 B.R.  350 (Bankr. E.D.N.Y. 1995).................................................................................14

*Ashland Mgmt., Inc. v. Janien*,
82 N.Y.2d 395 (1993) .............................................................................................................21

*Baker's Aid v. Hussmann Foodservice Co.*,
830 F.2d 13 (2d Cir. 1987).....................................................................................................29

*Bazak Int'l Corp. v. Tarrant Apparel Corp.*,
491 F. Supp. 2d 403 (S.D.N.Y. 2007)...................................................................................16

*Boston Laser, Inc. v. Qinxin Zu*,
Civ. A. No. 3:07-CV-0791, 2007 WL 2973663 (N.D.N.Y. Sept. 21, 2007) ....................12, 28

*Brennan's, Inc. v. Brennan's Rest., L.L.C.*,
360 F.3d 125 (2d Cir. 2004)...................................................................................................11

*Catalogue Serv. of Westchester Inc. v. Henry*,
107 A.D.2d 783, 484 N.Y.D.2d 615 (2d Dep't 1985) ...........................................................22

*Ciaramella v. Reader's Digest Ass'n*,
131 F.3d 320 (2d Cir. 1997)...................................................................................................14

*Colonize.com, Inc. v. Perlow*,
No. 03-CV-466, 2003 WL 24256576 (N.D.N.Y. Oct. 23, 2003) ..........................................25

*Doninger v. Niehoff*,
527 F.3d 41 (2d Cir. 2008)......................................................................................................19

*DoubleClick, Inc. v. Henderson*,
No.  116914/97, 1997 WL 731413 (Sup. Ct. N.Y. Co. Nov. 7, 1997) ..................................25

*EarthWeb, Inc. v. Schlack*,
71 F. Supp. 2d 299 (S.D.N.Y. 1999)....................................................................................... passim

*Emtec, Inc. v. Condor Tech. Solutions, Inc.*,
No. Civ. A. 97-6652, 1998 WL 834097 (E.D. Pa. Nov. 30, 1998)..............................................22

*Etablissement Asamar Ltd. v. Lone Eagle Shipping, Ltd.*,
882 F. Supp. 1409 (S.D.N.Y. 1995).........................................................................................13

*Firemen's Ins. Co. of Newark, N.J. v. Keating*,
753 F. Supp. 1146 (S.D.N.Y. 1990).........................................................................................28

*Flores v. Lower E. Side Serv. Ctr.*,
4 N.Y.3d 363, 369 (2005) .......................................................................................................15

*Freedom Holdings, Inc. v. Spitzer*,
408 F.3d 112 (2d Cir. 2005).....................................................................................................20

*Global Switching Inc. v. Kasper*,
No. CV 06 412, 2006 WL1800001 (E.D.N.Y. June 29, 2006)....................................................21

*Hanson Trust PLC v. ML SCM Acquisition, Inc.*,
781 F.2d 264 (2d Cir. 1986).....................................................................................................11

*Int'l Creative Mgmt. v. Abate*,
07 Civ. 1979, 2007 U.S. Dist. LEXIS 22964 (S.D.N.Y. Mar. 28, 2007) ...............................28, 29

*Int'l Bus. Machines Corp. v. Papermaster*,
Civ. A. No. 08-CV-9078, 2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008) ........................... passim

*Johnson v. Kay*,
860 F.2d 529 (2d Cir. 1988).....................................................................................................12

*Kensington Court Assocs. v. Gullo*,
180 A.D.2d 888 (3d Dep't 1992)..............................................................................................18

*Kreiss v. McCown De Leeuw & Co.*,
37 F. Supp. 2d 294 (S.D.N.Y. 1999)....................................................................................13, 15

*Lehman v. Dow Jones & Co.*,
783 F.2d 285 (2d Cir. 1986).....................................................................................................22

*Longo v. Shore & Reich, Ltd.*,
25 F.3d 94 (2d Cir. 1994) .....................................................................................................13, 17

*Marietta Corp. v. Fairhurst*,
301 A.D.2d 734 (3d Dep't 2003)....................................................22, 25

*Mazurek v. Armstrong*,
520 U.S. 968 (1997)....................................................................11

*McKay v. Communispond, Inc.*,
581 F. Supp. 801 (S.D.N.Y. 1983)................................................15

*N. Atlantic Instruments v. Haber*,
188 F.3d 38 (2d Cir. 1999)...........................................................21

*N.Y. Magazine v. Metro. Transp. Auth.*,
136 F.3d 123 (2d Cir. 1998)..........................................................12

*Pella Windows & Doors v. Buscarena*,
07 CV 82, 2007 U.S. Dist. LEXIS 52382 (E.D.N.Y. July 19, 2007) ............19

*R.G. Group, Inc. v. Horn & Hardart Co.*,
751 F.2d 69 (2d Cir. 1984)........................................................13, 14

*Reed, Roberts Assocs., Inc. v. Strauman*,
40 N.Y.2d 303 (1976)..................................................................24

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004)..........................................................13

*Reposystem, B.V. v. SCM  Corp.*,
727 F.2d 257 (2d Cir. 1984)..........................................................17

*Rodriguez v. DeBuono*,
175 F.3d 227 (2d Cir. 1999)..........................................................20

*SD Prot., Inc. v. Del Rio*,
498 F. Supp. 2d 576 (E.D.N.Y. 2007) ..............................................13

*Scheck v. Francis*,
260 N.E.2d 493 (N.Y. 1970).......................................................13, 18

*Silipos, Inc. v. Bickel*,
No. 1:06-cv-02205, 2006 WL 2265055 (S.D.N.Y. Aug. 8, 2006) ................22

*Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.*,
383 F. Supp. 2d 428 (S.D.N.Y. 2003)...............................................18

*Spinal Dimensions, Inc. v. Chepenuk*,

No. 4805-07, 2007 WL 2296503 (Sup. Ct. N.Y. Co. Aug. 9, 2007) .......................................26, 27

*Sussman v. Crawford*,
488 F.3d 136 (2d Cir. 2007)...........................................................................................................11

*Ticor Title Ins. v. Cohen*,
173 F.3d 63 (2d Cir. 1999)..............................................................................................................21

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*,
60 F.3d 27 (2d Cir. 1995) ...............................................................................................................12

*Winston v. Mediafare Entm't Corp.*,
777 F.2d 78 (2d Cir. 1985)...............................................................................................14, 16, 17

*Zucker v. Katz*,
836 F. Supp. 137 (S.D.N.Y. 1993)..................................................................................................18

## MISCELLANEOUS

Restatement of Torts § 757, comment b ..........................................................................................21

Restatement (Second) Of Contracts § 17 (1981) ...........................................................................13

## PRELIMINARY STATEMENT

Defendant David L. Johnson ("Mr. Johnson") hereby submits this Memorandum of Law in Opposition to International Business Machines Corporation's ("IBM" or "Plaintiff") Motion for a Preliminary Injunction.  Plaintiff cannot meet its burden of proving the required elements for preliminary injunctive relief, including substantial probability of success on the merits and immediate and irreparable harm.

Plaintiff's claim fails because there was no binding non-competition agreement between IBM and Mr. Johnson.  The proposed form of agreement was not a binding contract between the parties.  Moreover, Mr. Johnson repudiated IBM's overtures to enter into a binding contract, as IBM acknowledged by its conduct and in multiple emails that confirm that no agreement was reached.  Absent a binding non-competition agreement, IBM cannot demonstrate any probability of success on the merits.  It also cannot identify a legitimate protectable interest that would warrant an injunction preventing Mr. Johnson from working for Dell.

The factual record is incomplete at this point, but will be developed more fully through expedited depositions, which are to be taken during the week of June 15.  Pending that discovery, this Memorandum of Law is submitted to address the controlling legal principles and the facts that will be set forth in Mr. Johnson's affidavit (which will, in accordance with the Court's direction, be filed on June 15) and established at the hearing on June 22 through live testimony.

# COUNTERSTATEMENT OF FACTS[1]

## A.    Mr. Johnson's Employment at IBM

In 1981, Mr. Johnson commenced his employment at IBM as a Cost Financial Planner.  At the time of his resignation, effective June 1, 2009, Mr. Johnson was the Vice President of Corporate Development at IBM – a position he held for approximately eight years. In his position in Corporate Development, Mr. Johnson was responsible for directing IBM's non-organic growth strategy, which included acquisition execution and integration and minority investments.  Mr. Johnson reported to IBM's Chief Financial Officer ("CFO"), Mark Loughridge. Mr. Johnson was not responsible for creating IBM's strategic plans or dictating its strategic vision.  As Mr. Loughridge pointed out in his declaration, Mr. Johnson was responsible for stewardship of key customer relationships as part of a Partnership Executive Program ("PEP"). (*See* May 26, 2009 Declaration of Mark Loughridge, ¶ 11.)  Since 2006, however, the only IBM customers with which Mr. Johnson communicated relating to the PEP program were Lehman Brothers Inc. and Bear Stearns Companies.

## B.    Mr. Johnson's Alleged Exposure to Confidential Information

As Vice President of Corporate Development at IBM, Mr. Johnson's primary responsibilities were providing assistance to IBM's business units by identifying potential acquisition targets to maximize their opportunities.  Mr. Johnson's expertise did not relate to technical or scientific developments, or the creation of hardware, software or any aspect of artificial intelligence.  Mr. Johnson's ability to identify potential acquisitions was not based on IBM's confidential or proprietary information or trade secrets, but rather on analyses of other companies from publicly available sources of information.  Indeed, much of Mr. Johnson's work

---

[1]    This "Counterstatement of Facts" is based upon evidence that Mr. Johnson intends to prove at this Court's preliminary injunction hearing.  This overview is included to provide the necessary context for the relevant legal arguments that follow.

was reviewing data that was compiled and sent to him from external public sources, such as analysts, surveys and reports prepared by media organizations, investment banks, publications or consulting firms.  In light of rapid changes in the technology industry and routine fluctuations in capital markets, business outlooks and overall economic conditions, the acquisition targets Mr. Johnson considered for IBM changed rapidly.  Such information became stale almost immediately.  Mr. Loughridge recently confirmed that IBM constantly changes its business strategies.  At the Reuters Global Technology Summit, he stated, "every week we go through what our strategies are and how we're going to roll them out, and fundamentally move the corporation into new opportunities and value spaces."  (*See* Exhibit A, annexed hereto.)

In 1996, Mr. Johnson became one of approximately 300 members of IBM's Senior Leadership Team ("SLT"), which subsequently was renamed the "Integration & Values Team" (collectively, "I&VT").  During his time on I&VT, Mr. Johnson only attended 13 annual meetings.  An I&VT meeting typically involves presentations by IBM's Chairman and Senior Vice Presidents ("SVP"), which often include high-level overviews of IBM's prior year and business goals for the upcoming year.  Much of the information discussed at I&VT meetings is publicly available, or becomes so soon thereafter.  The last meeting Mr. Johnson attended was approximately four months ago.  Mr. Johnson does not believe that he learned any trade secrets or confidential information that would be useful to him or Dell Inc. ("Dell") through his membership on I&VT, and he does not believe he learned any information as a member of I&VT that would cause harm to IBM if he were to work at another company.

Mr. Johnson also does not believe that he learned any information that would cause harm to IBM or be useful to Dell through his membership on the Strategy Committee in 2008 and 2009.  Mr. Johnson attended ten Strategy Committee meetings, during which members

discussed various topics related to industry trends and geographic growth opportunities in the industry.  IBM conducted exclusive and well-guarded strategic planning meetings twice a year that did not include all of the members of the Strategy Committee or I&VT.  Mr. Johnson has not attended an IBM strategic planning meeting since the spring of 2000.

> **C.**    **The Purported Noncompetition Agreement**

In March 2005, IBM presented Mr. Johnson with a form of non-competition agreement.  Mr. Johnson was told that he had to sign the agreement to qualify for certain equity grants.  Mr. Johnson never agreed to the proposed restrictions.  Communications between Mr. Johnson and IBM between March 2005 and July 2006 confirm that no agreement was reached, and IBM has admitted in discovery that it never signed an agreement with Johnson.

As described at the TRO hearing on June 1, Mr. Johnson was hesitant to enter into a noncompetition agreement with IBM.  He was uncertain about his future opportunities at IBM and unhappy about IBM's failure to abide by certain promises.  In 2001, Mr. Johnson had foregone a lucrative career opportunity to become the CEO of another technology company based upon assurances that he would be considered for promotion to a General Manager position at IBM within two years.  In 2004, Mr. Johnson approached IBM's CFO, Mr. Loughridge, who assured Mr. Johnson that he would be considered for a General Manager position.  Mr. Loughridge indicated in a Long Term Development Plan that Mr. Johnson's "next position" would be in General Management, and slated the promotion for the fourth quarter of 2005.

While considering the form of non-competition agreement that he was sent in March 2005, Mr. Johnson contacted Randall MacDonald, the Senior Vice President of Human Resources, to confirm his prospects for promotion to a General Manager position.  Mr. MacDonald told Mr. Johnson that he would get back to him, but he did not do so by the time of the deadline for signing the agreement.  Mr. Johnson was unwilling to agree to the post-

employment restrictions until he confirmed his opportunity at IBM.  So, on IBM's deadline for returning the agreement, he deliberately signed the document on the line designated for IBM rather than the line designated for him.  By doing so, Mr. Johnson did not intend to be bound, and believed he was not bound, by the agreement.  He intended that his improper execution and rejection of the agreement would extend the amount of time that he could have to hear back from Mr. MacDonald before determining whether to agree to the restrictive covenants.

IBM shared Mr. Johnson's understanding that no binding agreement existed.  In the fall of 2005, IBM returned the original version of the agreement to Mr. Johnson, indicating that he had signed in the "wrong spot."  Critically, IBM did not sign the agreement, but rather sent a clean form of agreement back to Mr. Johnson with a request that he sign and return the document, so that IBM could sign it – which signature was required by IBM's internal procedures.  After IBM returned the agreement to Mr. Johnson, Mr. Loughridge contacted Mr. Johnson and said that Mr. Johnson would not become a General Manager.  As a result, Mr. Johnson decided not to sign IBM's non-competition agreement.

Over the next 12 months, members of IBM's Human Resources department called and emailed Mr. Johnson repeatedly, at least once a month, asking him to sign the agreement and return it for IBM's countersignature.  Finally, on July 18, 2006, Donna Riley, IBM's Vice President of Human Resources, wrote to Mr. Johnson:  "Hi Dave.  Hate to be a pest, but we're still working on getting all of the non-compete agreements signed and filed and yours isn't booked since the original was signed in the wrong place."  (*See* Exhibit B, annexed hereto.)  Ms. Riley said in the e-mail that Mr. MacDonald would contact Mr. Johnson about his equity grant status if he did not execute the document by the following Friday.

Mr. Johnson still did not execute and return the document.  Mr. MacDonald did not contact Mr. Johnson as Ms. Riley's e-mail indicated he would.

REDACTED

After several more emails from Ms. Riley attempting to procure an executed agreement, IBM abandoned its efforts to persuade Mr. Johnson to sign the agreement.  IBM never signed the agreement; despite that its own internal procedures mandate that it sign such agreements.  The version attached to the Complaint as Exhibit A is a copy of the one that Mr. Johnson signed in the wrong place, which IBM rejected and returned to Mr. Johnson.  Contrary to IBM response to Defendant's Requests for Admission claiming lack of knowledge about whether IBM returned the original improperly signed non-compete to him,

---

[2]    The reference to "05" is to the 2005 form of non-competition that Mr. Johnson was originally asked to sign.

6

REDACTED

### D.    Mr. Johnson's Equity Awards

Mr. Johnson first received equity awards from IBM in 1992.  From 1992 through 2009, Mr. Johnson received stock options, restricted stock units and performance share units under a long-term incentive plan.  In 2005, IBM changed its executives' compensation packages by reducing the amount of stock options granted to executives, but increasing the opportunity to receive restricted stock units and performance share units.  Despite the change, Mr. Johnson's total compensation package did not change appreciably for the years 2002 through 2006.

In connection with equity awards that Mr. Johnson was granted in 2005, 2006, 2007 and 2008, Mr. Johnson completed an electronic equity award acceptance form.  The 2005 and 2006 acceptance forms contained language stating that the grant of equity awards was subject to and conditioned upon Mr. Johnson's agreeing to the terms of a noncompetition agreement, "if" he had received one, and that the grant was not effective until he signed and returned the agreement.  The 2007 and 2008 acceptance forms did not reference a noncompetition agreement.  Mr. Johnson never accepted the terms of, or agreed to, any noncompetition agreement in connection with or following the issuance of these equity awards.

### E.    Mr. Johnson's Opportunity at Dell

In late 2008, a recruiter contacted Mr. Johnson concerning an opportunity at Dell. Mr. Johnson was interviewed, and Dell offered Mr. Johnson the position of Senior Vice President of Strategy on May 18, 2009.  Mr. Johnson commenced employment with Dell on June 2, 2009.[3]  As the Senior Vice President of Strategy at Dell, Mr. Johnson will be responsible

---

[3]    In accordance with a proposal from Mr. Johnson's counsel at the June 1, 2009 TRO hearing, Judge Karas restricted Mr. Johnson's initial activities to learning about Dell's business pending a preliminary injunction

7

for helping Dell set a strategic vision, mission and goals based upon its existing resources and internal capabilities.  Many rapidly changing factors are taken into consideration when developing a corporate strategy, including both external and internal factors.  Internal factors are unique to each business and often change based on external factors.  For example, Dell and IBM necessarily have distinct corporate strategies because the companies' internal factors are quite different.  IBM markets and sells high-performance business systems, such as information technology infrastructure, operating systems software and services.  In contrast, Dell sells more basic products, such as PCs, at a lower cost directly to businesses, government bodies and individual consumers.  Indeed, IBM's CEO, Sam Palmisano, recently told a group of investment professionals that IBM is "not like the other companies in the IT industry."  (*See* Exhibit H, annexed hereto.)  IBM is organized by product brand and geography, whereas Dell is organized by customer set.

IBM alleges that it competes with Dell in "design, manufacture and sale of electronic devices, including in particular enterprise servers and storage."  (Compl. at ¶ 29.)  Mr. Johnson's role at Dell, however, would have nothing to do with the design, manufacture or sale of any electronic devices.  To the contrary, he would focus on Dell's business model, organizational structure and organizational capabilities.  His job will not require him to draw upon any confidential information he may have learned at IBM.  The combination of the continuously changing internal and external factors requires a dynamic approach to strategy that will be vastly different for each company.  Any confidential information Mr. Johnson may have acquired while employed by IBM would not give Dell any competitive advantage over IBM.

---

hearing on June 22.  Judge Karas denied IBM's request for a TRO precluding Mr. Johnson's employment with Dell, noting that there were questions about whether IBM could establish the existence of a binding non-competition agreement.  (*See* pages 28-29 of the transcript from the TRO hearing, Exhibit G, annexed hereto.)

### F.    Mr. Johnson's Resignation and Efforts to Confer With IBM

On May 19, 2009, Mr. Johnson informed Mr. Loughridge, his direct supervisor, that he intended to leave IBM to join Dell as a Senior Vice President of Strategy.  The next day, Mr. MacDonald informed Mr. Johnson that if he left IBM he would lose more than $4 million in unvested and vested equity, including exercised equity awards that would be subject to a clawback.  Mr. MacDonald also told Mr. Johnson that IBM would prevent him from working for Dell by initiating a legal action against him in the same court from which it had obtained an injunction against Mark Papermaster only a few months earlier.[4]  Mr. MacDonald asked Mr. Johnson to reconsider his decision to leave IBM, and said that Mr. Johnson should call him no later than May 25, 2009 with his final decision.

Mr. Johnson explained to Mr. MacDonald that he would not violate any contractual obligation to IBM by working for Dell.  Mr. Johnson also explained that it would be a "win-win" situation for IBM and Dell if they could find a mutually agreeable solution to Mr. MacDonald's concerns.  Mr. Johnson gave his lawyer's name and number to Mr. MacDonald, which Mr. MacDonald wrote down, and asked that IBM contact his lawyer to discuss the matter and possibly resolve it without litigation.  Neither Mr. MacDonald nor Mr. Loughridge ever inquired as to the types of services that Mr. Johnson would provide to Dell or whether Mr. Johnson would be working in an area at Dell that competes with IBM.  Moreover, nobody from IBM contacted Mr. Johnson's lawyers to attempt an informal discussion or resolution.  Instead, IBM seems intent on keeping Mr. Johnson from working for Dell, despite the absence of a binding non-competition agreement, rather than taking reasonable steps to ensure that Mr. Johnson respects IBM's confidential information, as Mr. Johnson has promised to do.

---

[4]    This is the third lawsuit this year that IBM has filed in the Southern District of New York, despite the fact that, as reported in *Papermaster*, IBM does not "lightly sue its former employee[s]."  *Int'l Bus. Machs. Corp. v. Papermaster*, Civ. A. No. 08-CV-9078, 2008 WL 4974508, *13 (S.D.N.Y. Nov. 21, 2008).

### G.    Mr. Johnson's Hardship If He Is Barred From Working for Dell

The nature of Mr. Johnson's qualifications and skills requires that he deal with information that changes rapidly and requires constant attention.  If he is not in a position to monitor the external factors that guide and mold the ever-evolving technology industry, his skill set quickly will become obsolete.  Mr. Johnson must have access to the daily reports, survey, and analyses conducted industry-wide to stay abreast of the environment and applicable markets. After twelve months of not actively participating in the technology sector, Mr. Johnson would be at a significant disadvantage to find another position at any technology company.  Further, Mr. Johnson has developed a broad personal network of investment bankers, consulting groups, and Chief Information Officers.  Without a formal position in the industry for a year or more, he will be at risk of losing these contacts.  Therefore, imposition of a preliminary injunction on Mr. Johnson would disrupt, and could even destroy, his career.

### ARGUMENT

This case presents circumstances that are entirely inappropriate for preliminary injunctive relief.  Mr. Johnson never intended or believed that he was subject to a non-competition agreement, and IBM acknowledged on multiple occasions that no agreement had been reached. IBM returned the incorrectly signed document to Mr. Johnson and started again with a "clean" form that neither party signed despite repeated attempts by IBM to consummate an agreement. Now, without any such contract in place, IBM offers the Court exaggerated misstatements of inter-company rivalry and competition and speculative allegations of harm that IBM would supposedly suffer if Mr. Johnson were to work for Dell.

Notably, in light of this panoply of considerable hurdles, it is Plaintiff that must now meet its burden of proving both a substantial likelihood of success and immediate and irreparable harm in order to obtain a preliminary injunction – a form of relief that this Court

strictly analyzes and views as both "extraordinary" and "drastic."  As discussed further below, Plaintiff does not come close to proving either of these elements.  Rather, based on the indisputable evidence, it is apparent that Mr. Johnson – and not IBM – will succeed on the merits.

## I.     PLAINTIFF BEARS THE BURDEN OF PROVING CIRCUMSTANCES WARRANTING A PRELIMINARY INJUNCTION.

It is well-established that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (same).  A preliminary injunction is considered a "drastic" and "extraordinary" remedy that should not be granted routinely.  *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir. 1986).  "New York courts adhere to a strict approach to enforcement of restrictive covenants because their enforcement conflicts with 'the general public policy favoring robust and uninhibited competition,' and 'powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood.'"  *Am. Inst. of Chem. Eng'rs v. Reber-Friel Co.*, 682 F.2d 382, 386 (2d Cir. 1982) (quoting *Am. Broad. Cos. v. Wolf*, 52 N.Y.2d 394, 404 (1981)).  To obtain such relief, Plaintiff must demonstrate: "(1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious question going to the merits and a balance of hardships tipping decidedly in [Plaintiff's] favor."  *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 129 (2d Cir. 2004).

Moreover, if the preliminary injunction sought is either (i) mandatory in that it will alter the status quo if granted by commanding a positive act, or (ii) will provide all the equitable relief that the movant is seeking and, once complied with, cannot be undone, then a higher standard must be met – the "movant must show a substantial likelihood of success on the

merits, rather than merely a likelihood of success."  *Johnson v. Kay*, 860 F.2d 529, 540 (2d Cir.

1988); *Tom Doherty Assocs., Inc. v. Saban Entm't., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (applying

heightened standard when injunctive relief would provide "substantially all the relief that is

sought"); *Boston Laser, Inc. v. Qinxin Zu*, Civ. A. No. 3:07-CV-0791, 2007 WL 2973663, at *8

(N.D.N.Y. Sept. 21, 2007) (applying heightened standard in employee restrictive covenant

context (citing *N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 127 (2d Cir. 1998))).  This

heightened standard of review applies for two reasons.  First, because Mr. Johnson is already

working at Dell, granting Plaintiff the injunctive relief it seeks would alter the status quo.  "An

injunction that prohibits a party from refusing to permit some act may, as a practical matter, alter

the status quo." *Tom Doherty Assocs.*, 60 F.3d at 34.  Second, if the preliminarily injunctive

relief sought by Plaintiff is granted and Mr. Johnson is barred from working at Dell for some

time and then later prevails at trial, it will not be possible for him to reclaim the time he has

missed or undo the effect of the preliminary injunction.  *See id.* at 35.  Therefore, Plaintiff should

be held to this higher standard of proving a clear or substantial likelihood of success.

A.     **Plaintiff Cannot Prove A "Clear" Or "Substantial" Likelihood of Success.[5]**

From the face of the purported agreement and the course of dealings between the

parties, it is obvious that Plaintiff has no likelihood or even prospect of success.  Indeed: (1) Mr.

Johnson purposefully signed the agreement in the wrong place, thus evidencing his intent not to

enter into a contract or to subscribe to its terms; (2) IBM never executed the agreement; and

(3) IBM repeatedly attempted (but failed) to get a signed agreement after returning the original to

---

[5]     IBM asserts a likelihood of success on the merits primarily on its breach of contract claim.  (*See* IBM Brief at p. 14 n.2.)  Nonetheless, IBM states that it "believes that Mr. Johnson could not perform the duties for the position for which Dell has hired him without making improper use or disclosure of such information" to suggest it will also succeed on its misappropriation claim.  (*Id.*)  Mr. Johnson disputes that IBM will be able to succeed on its misappropriation claim for several reasons and, in light of IBM not raising the issue in its preliminary injunction papers, does not address the issue herein and reserves his right to challenge later IBM's assertion if it is raised in the future.

12

Mr. Johnson, thus manifesting its belief that it did not have a binding contract in place.  This Court cannot conclude that Plaintiff has clearly shown a substantial likelihood of success on the merits absent an enforceable agreement.  Therefore, preliminary injunctive relief is unwarranted.

> **1.** **To form an enforceable contract, New York law requires mutual assent and intent to be bound, including valid execution.**

"To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (citing Restatement (Second) Of Contracts § 17 (1981)). It is the intent of the parties that controls, and that principle extends in equal measure to the parties' signatures. *See Kreiss v. McCown De Leeuw & Co.*, 37 F. Supp. 2d 294, 299 (S.D.N.Y. 1999) ("It is a basic principle of contract law that absent the parties' intent to be bound, no contract can be formed.") (citations omitted); *see also SD Prot., Inc. v. Del Rio*, 498 F. Supp. 2d 576, 584 (E.D.N.Y. 2007) ("[A] name, written or printed, is not to be reckoned as a signature unless inserted with an intent, actual or apparent, to authenticate the writing.") (citation omitted). "An acceptance must be positive, unambiguous and contain no material variance from the terms of the offer." *Etablissement Asamar Ltd. v. Lone Eagle Shipping, Ltd.*, 882 F. Supp. 1409, 1412 (S.D.N.Y. 1995) (citations omitted).

If the parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs. *See Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 97 (2d Cir. 1994); *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984). "It is well settled that, if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed." *Scheck v. Francis*, 260 N.E.2d 493, 494 (N.Y. 1970) (citing cases); *see also R.G. Group*, 751 F.2d at 71; *Williston on Contracts* § 28, at

66-67 (3d ed.) ("It is . . . everywhere agreed that if the parties contemplate a reduction to writing of their agreement before it can be considered complete, there is no contract until the writing is signed.").

As a result, "if either party communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract."  *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985).  "What matters are the parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances."  *R.G. Group, Inc.*, 751 F.2d at 74 (citing cases).  Accordingly, "when a party gives forthright, reasonable signals that it means to be bound only by a written agreement, courts should not frustrate that intent."  *Id.* at 75. Whether the parties did in fact contemplate a signed writing is a question of fact the resolution of which requires the court to examine all of the facts and circumstances.  *Ciaramella v. Reader's Digest Ass'n*, 131 F.3d 320, 320 (2d Cir. 1997).

Finally, it is well-established that in the absence of a valid non-compete agreement, the courts will not imply one.  *See Am. Broad. Cos.,*52 N.Y.2d at 406 n.8.  The New York Court of Appeals has held that "[a]lthough in a proper case an implied-in-fact covenant not to compete for the term of employment may be found to exist, anticompetitive covenants covering the postemployment period will not be implied."  *Id*. at 406; *see also Am. Fed. Group, Ltd. v. Rothenberg*, 136 F.3d 897, 909 (2d Cir. 1998) (quoting same).

### 2.  The "Agreement" and its surrounding circumstances do not evidence the unambiguous intent on behalf of the parties to form an enforceable contract.

The overwhelming evidence demonstrates that the parties failed to enter into an enforceable contract, and, therefore, Plaintiff cannot legitimately impose restrictions on Mr. Johnson's prospective employment.  *See, e.g., In re Am. Preferred Prescription, Inc.*, 186 B.R.

14

350, 354 (Bankr. E.D.N.Y. 1995) (refusing to enforce covenant not to compete because defendant never executed agreement but instead returned with questions and comments); *McKay v. Communispond, Inc.*, 581 F. Supp. 801, 806 (S.D.N.Y. 1983) (refusing to enforce restrictive covenant because plaintiff could not establish existence of an express contract).

First, Mr. Johnson lacked the requisite intent to enter into a valid contract when he purposefully signed on the incorrect signature block of the Agreement.  (*See* Compl. Exhibit A.) Mr. Johnson did so deliberately to defer consideration of the agreement and to prompt further discussion because he believed that he was being misled by upper management (which belief later was confirmed).  Mr. Johnson's course of conduct reveals that he did not intend to enter into the agreement at any time; after signing in the wrong space, he unambiguously refused to sign a new, clean version of the agreement and then rejected repeated pleas from Plaintiff's Human Resources department to enter into a contract by signing the document.  *See Flores v. Lower E. Side Serv. Ctr.*, 4 N.Y.3d 363, 369 (2005) (finding in the absence of an executed agreement, "it is necessary to look . . . to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds").  Therefore, Mr. Johnson lacked the requisite intent to enter into this contract, and its terms cannot be enforced against him.  *Kreiss*, 37 F. Supp. 2d at 299 ("[A]bsent the parties' intent to be bound, no contract can be formed.").

IBM conceded that it did not have a signed agreement from Mr. Johnson that was ripe for final signature.  IBM never executed the agreement, despite that its own internal procedures mandate that it sign such agreements.  (*See* Compl. Exhibit A.)  IBM's conduct, including its emails to Mr. Johnson and its other internal emails, confirms that it did not intend to execute or enter into the agreement until it had a valid execution from Mr. Johnson, which it never received. Significantly, IBM returned to Mr. Johnson the original agreement that he had

improperly executed.  When Mr. Johnson refused to sign the second clean version, Plaintiff repeatedly harassed him to execute the agreement, stating on several occasions that it had been signed in the "wrong spot."  Plaintiff rejected Mr. Johnson's original signature on the agreement and treated it as never having been executed.  These circumstances do not evidence "mutual assent and intent to be bound" to the agreement.  *See Bazak Int'l Corp. v. Tarrant Apparel Corp.*, 491 F. Supp. 2d 403, 408 (S.D.N.Y. 2007) (finding the parties' actions established that there was never an "intent to be bound" by an agreement, which is necessary to form a valid contract).

The agreement is also not enforceable because it contemplated written execution by both parties (which was confirmed through the deliberative conduct of each), and yet (a) Mr. Johnson signed on the wrong line, and (b) Plaintiff never signed the agreement.  Both parties believed that written execution of the agreement was critical to its validity.  *See Winston*, 777 F.2d at 80 ("[I]f either party communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract.").  It defies logic and common sense that Plaintiff would take such steps if it did not believe that written execution of the agreement by both parties was necessary to have an enforceable contract.

Nor did Mr. Johnson confirm his agreement to the terms of the form non-competition agreement when he accepted equity grants.  Starting in 2005, grants were offered to Mr. Johnson electronically.  The message on the electronic grant screen stated that such awards "were not effective until" he signed and returned the agreement.  In accepting the awards, Mr. Johnson did not confirm his agreement to the terms of any non-competition agreement.  At best, IBM has a claim for the return of certain equity awards.  It cannot use the acceptance of the equity grants to bootstrap an agreement that was never formed.

16

The form non-competition agreement itself provides significant support for the argument that written execution was contemplated by Plaintiff because: (1) it uses the phrases "hereby agree" and "for purposes of this Agreement"; (2) it includes two signature blocks, one for each party, and one of which includes a dateline; (3) it expressly provides that the agreement "shall inure to the benefit of and be binding upon" IBM and its successors, which implies that it will be binding at some future time, i.e., upon execution; (4) it provides that modifications may only be made in a writing signed by both parties; (5) it includes a merger clause stating that the agreement sets forth "the entire understanding between the Employee and the Company concerning its subject matter"; and (6) it states as follows: "[t]he Employee and IBM represent that, in executing this agreement, the Employee and IBM have not relied upon any representations or statements made, other than those set forth herein, with regard to the subject matter, basis or effect of this Agreement."  (*See* Compl. Exhibit A.)

This language supports only one conclusion: the agreement had to be executed by both parties to be enforceable.  *See Longo*, 25 F.3d at 97 (relying on *Scheck* to hold that an employment agreement signed by the employee but not the employer was unenforceable because other factors "evidenced an intent that the parties would not be bound to the terms of their negotiations until the agreement was signed" and noting further that the fact that the employer subsequently accepted the employee's services could not "override the expressed intention to be bound by the contract only upon signing by both parties"); *Winston*, 777 F.2d at 81 (holding settlement agreement unenforceable when it had been signed by the defendants but not the plaintiff, noting, among other things, that the correspondence between counsel contemplated "consummation of the proposed settlement" and referred to the "proposed agreement" and that the draft agreement included references to an "Execution Date"); *Reposystem, B.V. v. SCM*

17

*Corp.*, 727 F.2d 257, 262 (2d Cir. 1984) (finding an intent for written execution to have been "conclusively establish[ed]" when the draft contract provided that it would be valid and binding "when executed and delivered"); *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.*, 383 F. Supp. 2d 428, 442 (S.D.N.Y. 2003) (concluding that signature blocks with space for execution dates and language contemplating execution "appear to place importance on the formalities of execution, thereby reflecting a mutual intent on the part of both parties not to be bound to the terms of the agreement until the agreement was executed") (citations omitted); *Zucker v. Katz*, 836 F. Supp. 137 (S.D.N.Y. 1993) (holding that an unsigned draft settlement agreement was unenforceable, observing, *inter alia*, that when the draft "declares on its face that 'when duly executed' it would set forth the parties' rights and obligations, that there were no other agreements between the parties, and that any modification in the agreement would also have to be in writing and signed, the evidence 'unequivocally' supports the position that the parties intended a writing") (internal quotations omitted); *Scheck*, 260 N.E.2d at 494-95 (finding contract unenforceable when employee signed but employer never did because it was "quite clear" that "the agreements were to take effect only after both parties had signed them").

In summary, Mr. Johnson and IBM never intended to enter into a valid non-competition agreement.  Their course of conduct and the fact that there was no written execution by the parties confirms this.  Therefore, IBM will be unable to succeed on the merits of its claim. *See Kensington Court Assocs. v. Gullo*, 180 A.D.2d 888, 889-90 (3d Dep't 1992) (holding "[w]ithout a contract capable of enforcement there can be no breach; without a breach there can be no likelihood of success; and absent the likelihood of ultimate success on the merits, the denial of [the preliminary injunction] was not an abuse of discretion").

18

**B.      IBM Has Not Shown that the Balance of Hardships is Decidedly in its Favor.**

Absent a clear and substantial likelihood of success on the merits, IBM must show that the balance of hardships is "decidedly in [its] favor." *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008).  As the foregoing demonstrates, it is Mr. Johnson who is likely to succeed on the merits in this matter, and, further, public policy is in his favor.  *See Am. Inst. of Chem. Eng'rs*, 682 F.2d at 386 (noting "the general public policy favoring robust and uninhibited competition," and "powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood").  Moreover, as explained *infra* at 24-28, IBM has not shown that it will actually suffer any harm if Mr. Johnson works for Dell in a position that does not involve the areas in which IBM and Dell compete – specifically, servers and storage.  IBM's claim is based on its speculation of what Mr. Johnson might do at Dell, rather than what he will be doing at Dell.

In contrast, Mr. Johnson will suffer significant and irreparable harm should he be prevented from continuing his employment at Dell.  If this Court grants the relief IBM demands here, it will promote IBM's attempt to sabotage Mr. Johnson's career.  Being unable to work in his relevant industry for a year will cripple Mr. Johnson's employment prospects.  This hardship must not be overlooked.  *See Pella Windows & Doors v. Buscarena*, 07 CV 82, 2007 U.S. Dist. LEXIS 52382, at *8 (E.D.N.Y. July 19, 2007) (holding that the balance of hardships favored the employee because he would be prevented from working in a field that would advance his career).

**C.      Plaintiff Cannot Demonstrate That it Will be Irreparably Harmed Absent an Injunction Because it Cannot Prove a Legitimate Protectable Interest.**

If the Court even gets this far in its analysis before rejecting Plaintiff's motion, the request for injunctive relief must also fail because Plaintiff cannot prove immediate and irreparable injury.  To establish irreparable harm, IBM "must demonstrate that absent a preliminary injunction [it] will suffer 'an injury that is neither remote nor speculative, but actual and imminent.'"  *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1999)); *see also EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 308 (S.D.N.Y. 1999) (explaining that if the irreparable harm identified is "remote, speculative, or a mere possibility, the motion must be denied").  "The mere possibility of harm is not sufficient:  the harm must be imminent and the movant must show it is likely to suffer irreparable harm if equitable relief is denied." *EarthWeb*, 71 F. Supp. 2d at 308.  "In the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied." *Rodriguez*, 175 F.3d at 234 (internal citations omitted).

**1.      The Alleged Agreement Does Not Protect Plaintiff's Legitimate Protectable Interests.**

This Court has enforced restrictive covenants only "to the extent that the covenant is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *AM Medica Commc'ns Group v. Kilgallen*, 261 F. Supp. 2d 258, 262 (S.D.N.Y. 2003) (internal quotations omitted).  A court will consider whether a non-competition agreement is reasonable in its scope only after determining that it is necessary to protect against such "unfair and illegal" conduct and not merely to insulate the employer from competition. *See Am. Inst. of Chem. Eng'rs*, 682 F.2d at 387.  Even if there were a basis to treat the unsigned noncompetition agreement as binding upon Mr. Johnson, the noncompete provisions should not be enforced to prevent Mr. Johnson

from working for Dell, because Plaintiff's legitimate protectable interests are not implicated.  *See id*.

Non-competition provisions should not be enforced unless their purpose is "(1) to prevent an employee's solicitation or disclosure of trade secrets; (2) to prevent an employee's release of confidential information regarding the employer's customers; or (3) in those cases where the employee's services to the employer are deemed special or unique."  *Papermaster*, 2008 WL 4974508, at *11 (quoting *Ticor Title Ins. v. Cohen*, 173 F.3d 63, 70 (2d Cir. 1999); citing *Global Switching Inc. v. Kasper*, No. CV 06 412, 2006 WL 1800001, at *15 (E.D.N.Y. June 29, 2006)).  Plaintiff does not allege that the second factor applies, and it cannot establish that the first or third factors apply.

First, Mr. Johnson has few if any of IBM's trade secrets.  The New York Court of Appeals has described a trade secret as "any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."  *Ashland Mgmt., Inc. v. Janien*, 82 N.Y.2d 395, 407 (1993) (quoting Restatement of Torts § 757, comment b); *N. Atl. Instruments v. Haber,* 188 F.3d 38, 44 (2d Cir. 1999) (same).  To determine whether information constitutes a trade secret, New York courts consider the following factors:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Papermaster*, 2008 WL 4974508 at *8 (quoting *N. Atl. Instruments*, 188 F.3d at 44) (internal quotation omitted).

New York courts consistently recognize that "mere knowledge of the intricacies of a business is simply not enough." *Marietta Corp. v. Fairhurst*, 301 A.D.2d 734, 739 (3d Dep't 2003); *Catalogue Serv. of Westchester Inc. v. Henry*, 107 A.D.2d 783, 784, 484 N.Y.D.2d 615, 615 (2d Dep't 1985); *see also Silipos, Inc. v. Bickel*, No. 1:06-cv-02205, 2006 WL 2265055, at *4 (S.D.N.Y. Aug. 8, 2006) (concluding things like "strategy information, such as future marketing plans" are not trade secrets). Although Mr. Johnson may have some knowledge of Plaintiff's future strategic plans, such information is not trade secret information. *See Lehman v. Dow Jones & Co.*, 783 F.2d 285, 297-98 (2d Cir. 1986) (finding information regarding availability of a certain company for merger, and the attractiveness of such an endeavor, was not a "process or device for continuous use in the operation of a business," but rather "information as to single or ephemeral events" that does not qualify as a trade secret under the Restatement definition); *Emtec, Inc. v. Condor Tech. Solutions, Inc.*, No. Civ. A. 97-6652, 1998 WL 834097, at *8 (E.D. Pa. Nov. 30, 1998) ("The identities of two companies as possible acquisition targets is not the type of information meant to be protected as a trade secret."). Mr. Johnson is not alleged to be in possession of "any formula, pattern [or] device," but rather to have had access to information that Plaintiff uses in connection with "strategic planning." (Compl. at ¶ 10.) According to the Complaint, this includes information about Plaintiff's planned investments and divestitures. (Compl. at ¶ 11.) This is hardly the kind of information typically considered to be trade secret information. *See Marietta Corp.*, 301 A.D.2d at 738 (rejecting trial court's "overly expansive definition" of trade secrets that would "encompass nearly all confidential business documents" and finding that "pricing data and market strategies" do not constitute trade secrets).

The other factors courts consider in evaluating whether information constitutes a trade secret further undermine IBM's claim. Significantly, the information Mr. Johnson

possesses about IBM is not valuable to Dell.  While there is limited competition between Dell and Plaintiff in markets for servers and storage, their businesses are otherwise distinct, and their merger, acquisition, divesture and integration strategies are wholly dissimilar.  IBM markets high-value, customer transforming arrangements, by marketing operating systems, software, servers and infrastructure.  Dell principally sells products, such as PCs, to businesses, government entities and consumers.  Their organizational structures are completely different.  As IBM's CEO recently reported, IBM is unlike other technology companies.  (See Exhibit H, annexed hereto.)

The information Mr. Johnson has about IBM's strategy will become stale quickly.  As IBM's CFO has publicly conceded, information concerning Plaintiff's strategic plans and potential acquisition targets changes frequently – as often as weekly.  (See Exhibit A, annexed hereto.)  Within a short period, an acquisition target's value may increase, customer reports may change to reduce the need for the acquisition or another more attractive company may become available for acquisition.  Thus, the information Mr. Johnson possesses became stale almost immediately.  Finally, much of the information made available to Mr. Johnson is known or accessible to others in the industry through analysts, public filings and records and marketing tools.

The Court's reasoning in *Papermaster* provides a useful contrast.  Mr. Papermaster admitted that he was exposed to "many of IBM's most sensitive trade secrets," including working for years with "the crown jewels of IBM's technology" – information which IBM "jealously guarded."  *Papermaster*, 2008 WL 4974508, at *8.  That the kind of technical information is fairly labeled a trade secret.  By way of contrast, Mr. Johnson was not responsible

for technology that was unique and proprietary, but rather a far more generalized array of information about IBM's strategy.

Finally, unlike in *Papermaster*, Mr. Johnson's skill set is not "special or unique," as those terms have been construed by New York courts in the restrictive covenant context. "Such characteristics have traditionally been associated with 'various categories of employment where the services are dependent on an employee's special talents; such categories include musicians, professional athletes, actors and the like.'" *EarthWeb*, 71 F. Supp. 2d at 313 (quoting *Ticor*, 173 F.3d at 70). In *Papermaster*, the Court concluded that Mr. Papermaster had specific knowledge about certain technologies in which IBM competed directly with the defendant's new employer, Apple. 2008 WL 4974508, at *12. Mr. Johnson's ability to engage in strategic analysis and his business acumen, however, are not "unique," as courts generally construe that term. Indeed, "no restrictions should fetter an employee's right to apply to his own best advantage the skills and knowledge acquired by the overall experience of his previous employment." *Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 307 (1976).

### 2. Plaintiff Cannot Establish Irreparable Harm Based on the Inevitable Disclosure Doctrine.

Plaintiff has not sought injunctive relief on its claim that Mr. Johnson would "inevitably disclose" IBM's trade secret information to Dell. Rather, the only relief specifically requested in the Complaint is an injunction ordering Mr. Johnson "to refrain from: (a) breaching the terms of his Noncompetition Agreement with IBM and (b) engaging in any employment arrangement with Dell in violation of IBM's rights under the Noncompetition Agreement." (Compl. at p. 8 ¶ A). The same language appears in its proposed Order. In its supporting Memorandum of Law, moreover, IBM states that it "seeks a preliminary injunction compelling Mr. Johnson to honor his contractual obligations. . . ." (IBM Br. at p. 2.) Likewise, the entirety

24

of the argument in IBM's Memorandum of Law addresses the non-competition claim in Count I, as opposed to the misappropriation claim in Count II.  (*Id*. at pp. 15-19.)

Nevertheless, it is appropriate to briefly address the misappropriation claim in the event IBM attempts to rely on the doctrine of inevitable disclosure as the basis for a finding of irreparable harm or to support a request for injunctive relief.  *See Colonize.com, Inc. v. Perlow*, No. 03-CV-466, 2003 WL 24256576, at *6 (N.D.N.Y. Oct. 23, 2003).  "[I]n its purest form, the inevitable disclosure doctrine treads an exceedingly narrow path through judicially disfavored territory."  *See EarthWeb*, 71 F. Supp. 2d at 310.  In New York, litigants have successfully invoked the doctrine of inevitable disclosure in two narrow contexts, neither of which exists here: (1) to establish irreparable harm when there is no express restrictive covenant, but there is evidence of misappropriation of trade secrets, or (2) as a basis for enforcing an express restrictive covenant not to compete, as evidence that the former employer has a legitimate interest in enforcing the covenant and that the former employer may suffer irreparable harm in the absence of enforcement.

> a.    **In the absence of actual misappropriation or a valid non-competition agreement, allegations of inevitable disclosure cannot establish irreparable harm.**

When, as here, an employee has not entered into a binding non-competition agreement, New York law does not permit reliance upon the doctrine of inevitable disclosure to establish irreparable harm absent actual disclosure or misappropriation of a trade secret.  *See EarthWeb*, 71 F. Supp. 2d at 308; *Marietta Corp.*, 301 A.D.2d at 734.  IBM has not claimed that Mr. Johnson has threatened to or actually has misappropriated trade secrets.  Plaintiff has offered no authority indicating that any New York court has enjoined a defendant from working for a competitor in the absence of evidence of misappropriation or the existence of a valid and enforceable noncompetition agreement.  Indeed, even *DoubleClick, Inc. v. Henderson*, No.

25

116914/97, 1997 WL 731413 (Sup. Ct. N.Y. Co. Nov. 7, 1997) – the "high water mark for the

inevitable disclosure doctrine in New York" – relied "heavily on evidence of the defendants'

overt theft of trade secrets and breaches of fiduciary duty." *EarthWeb*, 71 F. Supp. 2d at 310

(citing *DoubleClick*, 1997 WL 731413, at *7).

> **b.**     **Even if the agreement is binding, Plaintiff cannot use the
> inevitable disclosure doctrine to establish irreparable harm.**

The factors that guide a court when determining whether disclosure of trade

secrets is "inevitable" include "(1) the extent to which the new employer is a direct competitor of

the former employer; (2) whether the employee's new position is nearly identical to his old one,

such that he could not reasonably be expected to fulfill his new job responsibilities without

utilizing the trade secrets of his former employer; (3) the extent to which the trade secrets at

issue would be valuable to the new employer; and (4) the nature of the industry and its trade

secrets." *Spinal Dimensions, Inc. v. Chepenuk*, No. 4805-07, 2007 WL 2296503, at *7 (Sup. Ct.

N.Y. Co. Aug. 9, 2007).  Assuming, *arguendo*, that Mr. Johnson has trade secrets, IBM cannot

establish any of the foregoing factors.

Although IBM and Dell may compete within certain defined and limited markets,

that overlap is quite small.  Dell offers computer systems and services directly to a distinct

customer base, while IBM develops and manufactures information technology products and

services to large enterprises across a spectrum of industries worldwide.  Rather than compete for

IBM's business, Dell is IBM's customer, purchasing several IBM services and products.  Unlike

in *Papermaster*, Dell has not recently announced a decision to develop "the very type of product

that IBM sells to the market generally." *Contra Papermaster*, 2008 WL 4974508, at *10.

Second, Mr. Johnson's new position is designed not to compete with Plaintiff, and

both Mr. Johnson and Dell have expressed their willingness to work with Plaintiff to ensure that

Mr. Johnson does not perform competitive services.  Both Mr. Johnson and Dell respect Plaintiff's concerns with regard to its proprietary, confidential information; Mr. Johnson provided Plaintiff with his lawyer's contact information on at least two occasions, expressing a desire to find a "win-win" situation for both.  Further, Dell's Senior Vice President of Human Resources reached out to his counterpart at Plaintiff, suggesting that the two companies discuss an amicable business solution to assuage Plaintiff's concerns.

Third, not only was Mr. Johnson's job at IBM different from what it will be at Dell, but also any information concerning IBM will be irrelevant and useless to Mr. Johnson in his role at Dell.  Information concerning IBM's business plans and strategy would not translate to Dell's business model and organizational structure and capabilities.  Finally, any proprietary information that Mr. Johnson may have possessed while at IBM regarding mergers and acquisitions within the rapidly changing technology industry quickly becomes outdated and stale, thus having little value to Dell regardless.  As the court noted in *EarthWeb*, the technology industry changes rapidly, and, therefore, certain proprietary information will not offer any value to Dell.  *See* 71 F. Supp. 2d at 313.

Plaintiff has not presented sufficient evidence to invoke the doctrine of inevitable disclosure to support its claim that it will be irreparably harmed absent the issuance of an injunction.  While IBM vaguely avers that business information that Mr. Johnson had access to during his employment were in fact trade secrets, "these conclusory allegations do not provide an adequate basis upon which to determine whether [Mr. Johnson] would necessarily recall and disclose such secrets in his new employment (assuming he acts in the best of faith), the value of the trade secrets to [Dell], the harm to [IBM] that would be caused by disclosure and the role and nature of trade secrets with the industry in which [IBM] and [Dell] compete."  *See Spinal*

27

*Dimensions, Inc.*, 2007 WL 2296503, at *8. Even if Mr. Johnson "is aware of information that could be afforded secret protection," IBM has not shown "an imminent and inevitable risk of disclosure warranting preliminary relief," because Mr. Johnson's job responsibilities purposefully will not be the same as the services he performed at IBM, and Mr. Johnson can divorce the knowledge that he gained at IBM from the professional skills and expertise that he has developed over his career. *See EarthWeb*, 71 F. Supp. 2d at 316; *Boston Laser*, 2007 WL 2973663 at *9.

### 3. Plaintiff Cannot Rely on an Acknowledgment in the Alleged Contract to Establish Irreparable Harm.

Finally, Plaintiff erroneously argues that certain provisions in the form Agreement – which each of the 300 or so members of I&VT were asked to sign and that Mr. Johnson never properly executed – are sufficient because Mr. Johnson has already conceded that his services are "extraordinary, special and unique" and that a breach would cause Plaintiff irreparable harm entitling it to, *inter alia*, equitable relief. (Compl. at ¶ 1, Exh. A ¶¶ 1(a), 3.) But this argument is contrary to the law in this Circuit.

In seeking a preliminary injunction, "it is clear that the parties to a contract cannot, by including certain language in that contract, create a right to injunctive relief where it would otherwise be inappropriate." *Firemen's Ins. Co. of Newark, N.J. v. Keating*, 753 F. Supp. 1146, 1154 (S.D.N.Y. 1990). Even assuming, *arguendo*, that Mr. Johnson executed the agreement, there is "no authority that such a contract provision entitles the plaintiff to a *per se* finding of irreparable harm." *Int'l Creative Mgmt. v. Abate*, 07 Civ. 1979, 2007 U.S. Dist. LEXIS 22964, at *20 (S.D.N.Y. Mar. 28, 2007). These provisions, as a matter of law, do not constitute "conclusive evidence" that irreparable harm has occurred. *Id.* Rather, as the Second Circuit has held, "contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate."

28

*Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987).  Such a contract

provision "alone does not demonstrate that irreparable harm is imminent and likely."  *Int'l*

*Creative Mgmt.*, 2007 U.S. Dist. LEXIS 22964, at *20.

                Moreover, such self-serving language is not meaningful at all when, as here, the

contractual language was not specially negotiated or individually tailored to or with respect to

the former employee, but rather was form language used in approximately 300 employees'

agreements.  *See id*. at *20-21.  To conclude, based on the language contained in form

agreements signed by hundreds of employees – but not Mr. Johnson — that all of them are

"unique and extraordinary," and any material breach by any them would cause irreparable harm

to Plaintiff, "is internally inconsistent and runs contrary to the sort of case-by-case analysis

courts engage in to determine whether an employee is unique and whether an employer is faced

with imminent, irreparable harm."  *Id.*  Therefore, this stock language provides no support for

Plaintiff's claim of irreparable harm either.

## CONCLUSION

For the foregoing reasons, and because Plaintiff cannot meet its burden of proving facts warranting preliminary injunctive relief, Defendant respectfully requests that the Court deny Plaintiff's motion for preliminary injunctive relief.

Dated: June 12, 2009
      New York, New York

SCHULTE ROTH & ZABEL LLP

By: _____
      Ronald E. Richman
      Holly H. Weiss
      Sara Solfanelli

919 Third Avenue
New York, New York  10022
(212) 756-2000

MORGAN, LEWIS & BOCKIUS LLP

By: _____
      Michael L. Banks
      Michael S. Burkhardt

1701 Market Street
Philadelphia, PA  19103
(215) 963-5000

*Attorneys for Defendant*

Intentionally Left Blank

**Index of Exhibits**

**Exhibit A:**    Thomson Reuters Article, International Business Machines with Mark Loughridge at Thomson Reuters Global Technology Summit, New York, May 19, 2009

**Exhibit B:**    Email from Donna Riley to Dave Johnson, dated July 18, 2006

**Exhibit C:**    REDACTED

**Exhibit D:**    REDACTED

**Exhibit E:**    REDACTED

**Exhibit F:**    REDACTED

**Exhibit G:**    International Business Machines Corp. v. David L. Johnson, No. 09 CV 4826 (KMK), Transcript of Temporary Restraining Order Hearing, June 1, 2009

**Exhibit H:**    Bob Evans, http://www.informationweek.com Article, IBM CEO Sam Palmisano Tells Investors, 'We Got It All,' May 15, 2009

EXHIBIT A



4 of 6 DOCUMENTS

Copyright 2009 CQ Transcriptions L.L.C.
All Rights Reserved.
Copyright 2009 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

May 19, 2009 Tuesday

**TRANSCRIPT:** 051909a2221906.706

**LENGTH:** 11704  words

**HEADLINE:** International Business Machines with Mark Loughridge at Thomson Reuters Global Technology Summit New York - Final

**BODY:**

Corporate Participants

* Mark Loughridge International Business Machines Corporation - SVP and CFO

Conference Call Participants

* Thomson Reuters Journalist

Presentation

THOMSON REUTERS JOURNALIST: Just a quick question on the outlook that you gave very recently at your analyst meeting. Your forecast was for at least $9.20 EPS for this year and for next year, $10 to $11.

MARK LOUGHRIDGE, SVP AND CFO, INTERNATIONAL BUSINESS MACHINES CORPORATION: Yes.

THOMSON REUTERS JOURNALIST: And that's assuming this -- the following risky scenario, of revenue falling 7% in 2009 and being flat in 2010 at constant currency. So I just wanted to clarify a few points here, because analyst's forecasts seem to be slight -- just very, very slightly weaker than those forecasts.

And the main concern seems to be that the revenue, which might be beyond IBM's control, might be weaker than initially planned. So I just want to ask you firstly, what is your view on sales going forward, especially the second half of the year?

MARK LOUGHRIDGE: Well, let's first start out -- I mean, when I did this conference last year, we were talking about doing $8.50 a year. And we ended up the year at $8.89. So I think we've got a pretty good track record against --

International Business Machines with Mark Loughridge at Thomson Reuters Global
Technology Summit New York - Final FD (Fair Disclosure) Wire May 19, 2009
Tuesday

microphone inaccessible)?

   MARK LOUGHRIDGE: Well, there's great -- great M&A opportunities. I mean, look
at the M&A content. I mean, since 2000, we spent $20 billion acquiring more than
100 companies. Now, the bulk of those companies (multiple speakers} -- $20
billion -- that's $20 billion net, almost $25 billion gross -- acquiring more
than 100 companies.

   Those companies tend to be highly scalable intellectual property-based
acquisitions where we feel confidence that we can rapidly scale them to generate
the synergies that are required with these kind of multiples. And I think they
have substantial opportunities.

   One of the big buildout opportunities that we've capitalized on is in this
area of business analytics. So if you looked under business analytics, which we
spent a lot of time at the analyst meeting, and you said, well, what were some
of the fundamental elements there? Well, there are 12 acquisitions that we
started acquiring in 2005, and we spent around $8 billion.

   There was the organic investment in analytics. There was the mathematical
content that we were driving out of our Research division. I think this system
[S] for streaming interpretation data that we started five years ago, that's
going to have a big role in this.

   But there's tremendous opportunity in the acquisition space. We look at
acquisitions -- historically, we would have looked at acquisitions back in the
mid-'90s and we would have looked at them as kind of opportunistic, right?
There's a company and we think we could manage it better or we could integrate
it better or something like that. But an opportunistic.

   Now it's a very operational part of our business cadence. So I go through a
deal review every week. Every week, we go through what our strategies are and
how we would roll them out and how they fundamentally move the Corporation into
new opportunities and value spaces.

   That's a bigger reasons why you see that big growth in software profitability
from 2000 to 2008, going from $2.8 billion to $7.1 billion, it's just focused on
moving into those high-value spaces. And business analytics is a good example.

   THOMSON REUTERS JOURNALIST: So when you talk about business analytics, are
you talking about smaller companies? Or would you go --

   MARK LOUGHRIDGE: Well, the biggest in business analytics was Cognos. That was
about $5 billion. The next big biggest -- largest in that array was probably
FileNet. But underneath it, there's an array of much, much smaller businesses.

   HiLog was a very good acquisition. DataMirror was a great acquisition in that
space. But there's a number of many of them smaller, but there are key
ingredients to that overall business analytics capability that we're bringing to
market and that we're so excited in.

   So they're not -- we don't look at acquisitions as just the next bolt-on to
drive a revenue increment. We look at them as key elements of our strategy and
our ability to deliver comprehensive solutions to our customer bases. I think
right now, the best example of that is the business analytics and optimization
capability.

# EXHIBIT B

Donna Riley/Armonk/IBM

07/18/2006 01:53 PM

Custom expiration date of
07/18/2007

To   Dave Johnson/Armonk/IBM@IBMUS

cc   Margaret Sohr/Armonk/IBM@IBMUS

bcc

Subject   Signed Non-Compete

Hi Dave.  Hate to be a pest, but we're still working on getting all of the non-compete agreements signed and filed and yours isn't booked since the original was signed in the wrong place.  I'm asking my team to have a **hard copy put in your mail today** since anyone who hasn't returned theirs to Chris Gregory in North Castle by end of day Friday will receive a personal call from Randy regarding the status of their equity grant.

I'm enroute to Madrid tonight but if there is anything on this you want to discuss, Maureen can find me.

Thanks, Dave.
Donna

Vice President, HR - Corporate
IBM, New Orchard Road, Armonk, NY
8/641-5289/ (914) 499-5289

EXHIBIT C

# REDACTED
## PURSUANT TO PROPOSED CONFIDENTIALITY STIPULATION AND PROTECTIVE ORDER

EXHIBIT D

# REDACTED
## PURSUANT TO PROPOSED CONFIDENTIALITY STIPULATION AND PROTECTIVE ORDER

EXHIBIT E

# REDACTED
## PURSUANT TO PROPOSED CONFIDENTIALITY STIPULATION AND PROTECTIVE ORDER

EXHIBIT F

# REDACTED
## PURSUANT TO PROPOSED CONFIDENTIALITY STIPULATION AND PROTECTIVE ORDER

EXHIBIT G

060109P2.txt

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
INTERNATIONAL BUSINESS MACHINES
CORPORATION,
                    Plaintiff,

            v.                      09 CV. 4826 (KMK)

DAVID L. JOHNSON,
                    Defendant.
-------------------------------x
                         U.S. Courthouse
                         White Plains, N.Y.
                         June 1, 2009
                         4:30 p.m.


Before:  HON. KENNETH M. KARAS,
              United States District Judge


APPEARANCES

CRAVATH SWAINE & MOORE, LLP
BY:  STEPHEN S. MADSEN, Esq.
     MAREK KRZYZOWSKI, Esq.
Worldwide Plaza
825 Eighth Avenue
New York, N.Y.  10019-7475

MORGAN LEWIS & BOCKIUS, LLP
BY:  MICHAEL L. BANKS, Esq.
1701 Market Street
Philadelphia, PA  19103-2921
          and
SCHULTE ROTH & ZABEL, LLP
BY:  RONALD E. RICHMAN, Esq.
919 Third Avenue
New York, N.Y.  10022
Attorneys for Defendant

Sue Ghorayeb, R.P.R., C.S.R.
Official Court Reporter


2

1            THE CLERK:  International Business Machines

2    Corporation v. David L. Johnson, 09 Civil 4826.

060109P2.txt

15   all I'm doing.  But would Mr. Johnson be prepared to sign an

16   affidavit, even if it were a stipulation or just an affidavit

17   that he will spend the next ten business days, the next two

18   weeks, simply meeting people at Dell and reading their, you

19   know, internal memoranda and whatnot, and not provide any

20   strategic advice to Mr. Dell or anybody else in the company?

21         MR. RICHMAN:  Yes, he is prepared to do that.

22         THE COURT:  Okay.  Under the penalties of perjury

23   and contempt of Court.

24         MR. RICHMAN:  Yes, sir.

25         THE COURT:  Okay.  Here is my reaction then.

         Sue Ghorayeb,  Official Court Reporter

⬜                                                                               28

1         My reaction is, I mean the idea that I would throw

2   the case out because there is no contract, that's not going

3   to happen, because the allegations in the Complaint are taken

4   to be true and the allegations are what they are.

5         For purposes of whether or not the Complaint states

6   a claim, my quick review of the Complaint is it absolutely

7   states a claim.  That doesn't mean that everybody who files a

8   claim gets a TRO.

9         MR. RICHMAN:  Correct.  That's why, that's why I

10   was really focussed on the TRO, the preliminary injunction.

11         THE COURT:  I just want to be clear.

12         MR. RICHMAN:  Yes.

13         THE COURT:  And, of course, the test, as you all

14   heard me say in the last case, irreparable injury, plus

15   either the likelihood of success on the merits or the balance

16   of equities tipping in this case in IBM's favor.

17         There is no question that in these types of cases

060109P2.txt

18    irreparable harm is presumed if there is such an agreement,

19    and I won't belabor the record with that, because you all

20    know the case law probably better than I do on this.

21         But I have to say, Mr. Madsen, my take on this is

22    that, to the extent that Mr. Johnson is going to sign this

23    affidavit, and you all can work out stipulated language, if

24    it makes your client more comfortable, I will defer to you on

25    that, but there are some questions about the contract.


              Sue Ghorayeb,  Official Court Reporter
                                                        29


1     This memo from the Human Resources Department, the

2    notion that IBM represented to Mr. Johnson that his signature

3    was not good, there was some sticker, they wanted him to sign

4    in a different spot, it's not clear to me that there is a

5    meeting of the minds.  And there seems to me to be at least

6    some conflicting evidence about whether his receipt of these

7    awards reflected his consent to be bound by the noncompete

8    agreement, or his consent, if he doesn't agree to the

9    noncompete agreement, he has to give the equity awards back,

10    unclear to me.  I mean based on the language that was read to

11    me, it may be the latter.

12         I am not saying you don't have a case.  I am not

13    saying you are not going to get a preliminary injunction.

14    But the combination in my view of Mr. Johnson going to this

15    orientation program and him stating under oath and subject to

16    the penalties of contempt that all he is going to do is, you

17    know, be the new kid on the block, fill out the tax forms,

18    find out where the mens' room is and then learn about Dell,

19    it seems to me while from IBM's perspective it's to be viewed

20    suspiciously, I think the balance of the equities tips not in

Page 26

060109P2.txt

21  IBM's favor, and I don't even see -- at this point, I can't

22  say at this point there is a likelihood of success on the

23  merits.

24          I am not saying that there won't be, but I do think

25  it's very important that, that Mr. Johnson be allowed to

            Sue Ghorayeb,   Official Court Reporter

                                                        30

1   brief this issue, and then if you all want to work out some

2   discovery schedule, that's fine, but I can also just put this

3   down for preliminary injunction hearing two weeks from now,

4   if that's going to make you feel more comfortable.

5           And my guess is the discovery will come in the form

6   of your exhibits to affidavits that will no doubt address the

7   issue about the validity of the contract, in any event, but I

8   could be wrong.  Okay.  So that that -- that's a, that's a

9   poorly worded ruling, but let me give you a date.

10          MR. MADSEN:  Excuse me.  May I just respond, Your

11  Honor?

12          THE COURT:  Yes, please.

13          MR. MADSEN:  On the thought that he should be

14  permitted an orientation period with Dell subject to the sort

15  of certifications that Your Honor mentioned, I'm, I'm really

16  uncomfortable with that, because I don't think that Mr.

17  Johnson can just sit there and listen.  He wasn't hired to

18  sit there and listen.  And I don't really think there can be

19  any prejudice to Mr. Johnson or to Dell if he doesn't do this

20  non-substantive listening for a couple of weeks while we

21  resolve the issue.

22          I think that -- I appreciate Your Honor's reaction,

23  as Your Honor did, to Mr. Richman's recital of documents

                        Page 27

EXHIBIT H

Case 7:09-cv-04826-SCR-LMS Document 21 Filed 06/12/09 Page 58 of 59

📧 Email 🖨 Print ◁ Share

**3** Comments

**Channel:** Global CIO

See all blogs by Bob Evans



# IBM CEO Sam Palmisano Tells Investors, 'We Got It All'

**Posted by Bob Evans on May 15, 2009 08:05 AM**

In a candid and often flinty presentation to investors, IBM CEO Sam Palmisano says there's a simple reason why IBM is able to predict continued strong earnings growth while other companies hedge on forecasts: "We are *not like* the other companies in the IT industry. We're *not*. We've completely transformed the IBM company." Not clear enough? Try this: "Now look: We got it all."

Palmisano made his comments at the beginning of a four-hour briefing to investors featuring many of IBM's top executives. Saying he would leave the detailed discussions to his lieutenants, Palmisano chose to use his opening presentation to retrace a bit of IBM's history over the past several years and tie that perspective into the company's recent financial performances that have outpaced most of the IT industry.

In so doing, Palmisano seemed to relish the opportunity to jab back at investors who had questioned his strategies during the transformation he spoke of, and he was quite blunt in telling the investment professionals that their puzzlement over IBM's stated clarity and confidence is a product of their own inability or unwillingness to analyze the company's strategy and performance as a standalone entity, rather than as a member of a larger group.

Speaking in unique style where certain words are given particular emphasis and certain key phrases are repeated, Palmisano took the investors to task for lumping IBM in with other IT companies and failing to recognize, in his opinion, the singular steps the company had taken to separate itself sharply from the pack.

"A lot of people have said to me, 'You guys are defying gravity.' We're not defying gravity – we had a record year in 2008. We got out *ahead* of it. It's not about defying gravity – we got out ahead of it.

"We took a lot of stuff last year, and a lot of stuff earlier this year, to reduce our run rate of cost and expense by $3 billion. So we're *not* fighting physics. We just had the financial flexibility to get ahead of it – one might call it insight; call it whatever you want to call it, conclude whatever you'd like to conclude; we just *did* it, we're *done*. Most of it's *done*.

A short time later, Palmisano returned to the matter of the confusion expressed by many analysts over IBM's ability to make clear predictions in this turbulent market. And in his words and his tone and his decision to come back and reiterate a point he'd made quite clearly a few minutes earlier, it became clear that Palmisano was enjoying – really enjoying – the role of an experienced professor repeating a complicated but clear lesson to a set of students who before today had perhaps not been paying attention

as closely as the professor would have liked.

"Now again, I'm just repeating comments other people have made, and I said it once before: 'You guys are defying gravity – you're fighting physics – how can you sit there and say, 'At least $9 or $10 this year – how can you even give a projection in this environment? Ya-ya-ya, ya-ya-ya.'

"Now *look*: we *got* it all. *Why?* Since nobody's asking us *why* -- 'No one expects you to [make projections], so why would you do it?' Because you need to keep things in perspective: We are *not like* the other companies in the IT industry. We're *not*. We've completely transformed the IBM company. We're *not*.

"And we're not crazy kids. So we don't throw numbers out to throw numbers out. Y'know, we're not that short-term oriented. I'm an old guy – and Mark's [CFO Mark Loughridge] not getting any younger in his job – so, you've gotta reflect on that – this is IBM, this is not, y'know, we're not running around up here dressed in fads, and sunglasses, and whatever kinda designs, so, what is it?

"Well, we're different – we're different because, take our geographic mix, our balance of geographies – we're out in all these countries, we've expanded beyond the BRICs, now we're looking at 16 countries beyond the BRICs, and we're not *entering* those markets [chuckles] – we've *exited* India more times than other people have *gone in*. Y'know, we've been in Brazil – I celebrated the 95th anniversary of IBM Brazil – so I mean it's hard to think of that as an emerging market.

"But, I mean, business is good there, and business is good in others, so we're capturing that and taking advantage of that." He didn't add – but could have – "And don't you forget it."

In the next installment of Palmisano's presentation of IBM's strategy, we'll take a look at growth areas he foresees for IBM and the ways in which he intends to have IBM take very full advantage of stimulus packages being offered by China, the U.S., and other countries.

## Discuss This

3 message(s). Last at: May 21, 2009 8:48:33 AM

**IT EXEC Consultant**
commented on May 21, 2009 8:48:33 AM

If Sam was so "satisfied" with the portfolio he has, why did he make a very public run at Sun ? Oh well, even those with "all the riches" are really never satisfied. JS

*Guest*
commented on May 15, 2009 10:12:20 AM

Hi Anon---yes, the audio and slides are available through the link in the second paragraph of the blog post.

**ANON1242394061801**
commented on May 15, 2009 9:32:47 AM

Is the presentation (slides) available online?

This is a public forum. United Business Media and its affiliates are not responsible for and do not control what is posted herein. United Business Media makes no warranties or guarantees concerning any advice dispensed by its staff members or readers.

Community standards in this comment area do not permit hate language, excessive profanity, or other patently offensive language. Please be aware that all information posted to this comment area becomes the property of United Business Media LLC and may be edited and republished in print or electronic format as outlined in United Business Media's Terms of Service.

**Important Note:** This comment area is NOT intended for commercial messages or solicitations of business.