UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                                        Plaintiff,

                    vs.

DAVID L. JOHNSON,

                                        Defendant.

No. 09-cv-4826 (SCR) (LMS)

**AMENDED COMPLAINT**

International Business Machines Corporation ("IBM" or the "Company"), by and through its undersigned attorneys, states as follows:

### Nature of the Action

1.       IBM brings this action to prevent David Johnson, a senior IBM executive with responsibilities for directing IBM's mergers, acquisitions and divestiture strategy, from assuming a senior strategy position at Dell Inc. ("Dell"). By virtue of his responsibilities, Mr. Johnson is in possession of IBM's most highly sensitive confidential strategic information. By accepting a senior strategy position with IBM competitor Dell, Mr. Johnson has breached a noncompetition agreement (the "Noncompetition Agreement", a true and correct copy of which is attached hereto as Exhibit 1) with, and confidentiality obligations to, IBM.

2.       In addition, if permitted to assume the duties of a senior strategic post at Dell, Mr. Johnson will inevitably disclose IBM's trade secrets and proprietary information to Dell, a major competitor of IBM, in violation of his legal duties to IBM. That there is a grave risk of such disclosure is shown by the record in this proceeding and information developed in

discovery, which show that for a period of years Mr. Johnson has secretly misused IBM's

facilities, resources and personnel for his own advantage and to IBM's detriment.

**Parties**

3.      IBM is a corporation organized under the laws of the State of New York with its

principal place of business located in Armonk, New York, within the Southern District of New

York.

4.      Upon information and belief, Mr. Johnson is an individual who resides at

9 Stonewall Lane, Ridgefield, CT 06877.

**Jurisdiction and Venue**

5.      Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because

the matter in controversy exceeds the sum of $75,000, exclusive of costs and interest, and there

is complete diversity of citizenship between the parties.

6.      Pursuant to 28 U.S.C. § 1391, venue properly lies in this Court because IBM's

headquarters and principal place of business are situated within this judicial district, a

substantial part of the events giving rise to the claims occurred in this judicial district, and the

parties agreed in their Noncompetition Agreement to submit to the exclusive jurisdiction of and

venue in the federal and state courts of the State of New York, County of Westchester, for the

resolution of all disputes arising under, or relating to, that Agreement.

**Relevant Facts**

**IBM**

7.      IBM is one of the world's largest technology companies.  With approximately

400,000 employees working in locations across the world, IBM is a globally-integrated

enterprise that operates in various areas of high technology.

-2-

8.      Among the product areas in which IBM competes are enterprise servers and storage, which are highly competitive and characterized by ongoing technological innovation.

**David L. Johnson**

9.      Mr. Johnson was employed by IBM for more than 27 years.  For the last 9 years, he held the position of Vice President of Corporate Development.  In this position, Mr. Johnson directed the Company's mergers, acquisitions and divestiture strategy and gained possession of IBM's most highly sensitive confidential strategic information.  Mr. Johnson reported directly to Mark Loughridge, Senior Vice President and Chief Financial Officer of the Company.

10.      For the past 9 years, Mr. Johnson played an active role in all aspects of IBM's strategic planning relating to corporate transactions, including actual and potential acquisitions and dispositions and strategy related thereto.   The actual and potential corporate transactions as to which Mr. Johnson has knowledge span the entire range of IBM businesses and product lines.

11.      Through his employment, Mr. Johnson gained access to highly sensitive confidential information that the Company uses in its most sensitive strategic planning relating to the future of the corporation.  This strategic planning is integral to the Company's strategy for competition across the range of its businesses, including enterprise servers and storage.  The information that Mr. Johnson possesses is among the Company's most competitively sensitive information, is carefully guarded, not made accessible to the public or to IBM's competitors, and is disclosed even to IBM employees on a strict "need to know" basis.  It could not be replicated from public sources.

12.      Among the highly sensitive information Mr. Johnson possesses is, for example, information regarding where and in what companies and technologies IBM will invest, at what times, with what rates of return, as well as information regarding potential divestitures.

13.     In addition, Mr. Johnson was a member of the Company's elite Integration & Values Team ("I&VT"), a group comprising the 300 senior managers of the Company.

14.     The I&VT is charged with addressing the most difficult and important issues facing IBM, such as developing corporate strategy and driving innovation and growth, and I&VT members work with the most sensitive strategic information the Company possesses.

15.     In his capacity as a member of the I&VT, Mr. Johnson gained access to confidential information concerning the Company's strategic plans, marketing plans and long-term business opportunities, including the development status of specific IBM products.

16.     The confidential information to which Mr. Johnson has become privy based on employment with the Company and his membership in the I&VT is critical to IBM's competitive success.   Such information is carefully guarded, not made accessible to the public or to IBM's competitors, and is disclosed even to IBM employees on a strict "need to know" basis.   It could not be replicated from public sources.

**The Noncompetition Agreement**

17.     In 2005, Mr. Johnson executed the Noncompetition Agreement with the Company.

18.     In that agreement, Mr. Johnson agreed that

"during [his] employment with IBM and for one (1) year following the termination of [his] employment . . . . [he] will not directly or indirectly within the 'Restricted Area' (i) 'Engage in or Associate with' (a) any 'Business Enterprise' or (b) any significant competitor or major competitor of the Company."

(Noncompetition Agreement § 1(b).)

19.     In the Noncompetition Agreement, "Restricted Area" is defined as "any geographic area in the world for which [he] had job responsibilities during the last twelve (12) months of [his] employment with the Company."   (*Id.* § 2(d).)

20.   In the Noncompetition Agreement, "Engage in or Associate with" is defined to mean, among other things, acting as an "associate, employee, member, consultant, contractor or otherwise." (*Id.* § 2(c).)

21.   In the Noncompetition Agreement, "Business Enterprise" is defined as "any entity that engages in . . . competition with the business units or divisions of the Company in which you worked at any time during the two (2) year period prior to the termination of your employment." (*Id.* § 2(a).)

22.   Mr. Johnson also agreed to nonsolicitation covenants, more specifically that

"during [his] employment with IBM and for one (1) year following the termination of [his] employment . . . . [he] will not directly or indirectly within the 'Restricted Area' . . . solicit, for competitive business purposes, any customer of the Company with which [he was] involved as part of [his] job responsibilities during the last twelve (12) months of [his] employment with the Company."; and

"for the two (2) year period following the termination of [his] employment . . . [he] will not directly or indirectly within the 'Restricted Area,' hire, solicit or make an offer to any employee of the Company to be employed or perform services outside of the Company."

(*Id.* § 1(b).)

23.   Additionally, in the Noncompetition Agreement, Mr. Johnson made several important acknowledgments. Among others, Mr. Johnson expressly acknowledged that

"the business in which IBM and its affiliates . . . are engaged is intensely competitive" (*id.* § 1(a));

"[his] employment by IBM has required, and will continue to require, that [he] have access to, and knowledge of, confidential information of the Company, including, but not limited to, certain or all of the Company's methods, information, systems, plans for acquisition or disposition of products, expansion plans, financial status and plans, customer lists, client data, personnel information and trade secrets of the Company, all of which are of vital importance to the success of the Company's business" (*id.*);

"[his] services to the Company are, and will continue to be, extraordinary, special and unique" (*id.*);

"the Company would suffer irreparable harm if [he failed] to comply with [the noncompetition and the nonsolicitation covenants]" *(id.* § 3); and

"the restrictions set forth in [the covenants] are reasonable as to geography, duration and scope" *(id.).*

24.     Mr. Johnson has repeatedly confirmed his agreement to the terms of the Noncompetition Agreement in connection with his acceptance of equity grants.

### The Confidentiality Agreement

25.     In 1981, Mr. Johnson signed an Agreement Regarding Confidential Information and Intellectual Property (the "Confidentiality Agreement"), a true and correct copy of which is attached hereto as Exhibit 2.  Under the terms of the Confidentiality Agreement, Mr. Johnson must "not disclose to anyone outside of IBM or use in other than IBM's business, either during or after [his] employment, any confidential information or material of IBM".  (Confidentiality Agreement, § 1)

### Mr. Johnson's Equity Awards and Other Compensation

26.     IBM maintains programs for purposes of compensating its senior executives with equity-based compensation.

27.     Under the terms of those plans, compensation previously awarded to an executive must be returned to IBM under certain circumstances, including if the executive leaves IBM to work for a competitor.  The employee also covenants (among other things) not to hire or solicit other IBM employees or IBM customers.

28.     Pursuant to IBM's programs of equity-based compensation, Mr. Johnson has received from IBM substantial awards of equity-based compensation.

### Mr. Johnson's Decision to Join Dell

29.     Recently, Mr. Johnson informed his superiors at IBM that he intended to accept a position at Dell.

30.     On information and belief, the position is that of Senior Vice President of Strategy at Dell.

31.     On information and belief, through his employment at Dell, Mr. Johnson will be in a position to advise Dell regarding competitive strategy, including corporate transactions, and will necessarily rely upon and be in a position to reveal highly confidential IBM information regarding IBM's competitive strategy, including corporate acquisitions.

32.     On information and belief, Mr. Johnson's position at Dell will require him to have responsibilities for a geographic area for which he held responsibilities at IBM in the past 12 months.

33.     On information and belief, Dell is a corporation organized under the laws of the State of Delaware, with its principal place of business in Round Rock, Texas.

34.     Dell and IBM are competitors in the design, manufacture and sale of electronic devices, including in particular enterprise servers and storage, in which they compete heavily. IBM identified Dell in its 2009 10-K as a "principal competitor" in this area.  Dell identified IBM in an exhibit to its 2009 10-K as a "Direct Competitor".

35.     Indeed, Dell's website compares its servers with IBM servers and features a graphic with the quote "HP and IBM should be very afraid . . .".  IBM's website includes comparisons with Dell servers, including a page entitled "Migrate from Dell".

**Mr. Johnson Would Inevitably Disclose IBM's Trade Secrets**

36.     Mr. Johnson cannot perform the duties of a position such as Senior Vice President of Strategy for a major competitor such as Dell without disclosing or making use of his broad knowledge of IBM's trade secrets and proprietary information.  Mr. Johnson could not advise Dell on the subject of strategy without drawing on his knowledge of such matters as IBM's strategies, competitive initiatives, product development plans, technological initiatives

and marketing strategies and plans. Such improper and unlawful misuse and misappropriation of IBM's proprietary information would occur even if Mr. Johnson made a good faith effort to comply with his obligations to IBM.

37.     Mr. Johnson, however, has shown that he cannot be trusted even to attempt to safeguard IBM's interests in compliance with his legal obligations to IBM. Both the public record of this proceeding and the preliminary discovery that has taken place demonstrate Mr. Johnson's studied disregard of his obligations to IBM.

38.     First, and perhaps most remarkably, Mr. Johnson has repeatedly contended that he does not possess any IBM trade secrets or other proprietary IBM information. He has also contended that the information he has derives solely from public sources and that the information has only the most ephemeral utility. He has made such contentions even though he is privy to IBM plans and strategies that look to IBM business activities several years in the future that never been disclosed.

39.     Second, Mr. Johnson has taken the position that by such technicalities as signing a contract on the wrong line, he can escape responsibility for his obligations thereunder. Moreover, he has contended that this stratagem prevented him from incurring contractual obligations and responsibilities, even though he accepted the very substantial compensation that was expressly linked to his acceptance of those obligations and responsibilities.

40.     Third, materials uncovered during preliminary discovery in this matter have identified a concerted pattern of misuse of IBM's resources and IBM's confidential information by Mr. Johnson in pursuit of his own financial interests throughout at least the preceding four years.

41.     Beginning in at least 2005, Mr. Johnson took substantial steps toward the creation of a venture capital firm with a focus on investments in the technology sector. Along with two

other individuals, Mr. Johnson conceived of this venture, which was named "JSJ Capital Management", with one of the "Js" referring to Mr. Johnson.

42.    In furtherance of this venture, Mr. Johnson relied upon extensive work done by at least one other IBM employee.

43.    Both Mr. Johnson and the IBM employee with whom Mr. Johnson was working used IBM's facilities in pursuit of their own personal financial interests regarding JSJ.

44.    Mr. Johnson and the IBM employee with whom he was working also devoted significant time during regular work hours to the proposed JSJ venture rather than to the IBM responsibilities for which IBM was compensating them.  In addition, Mr. Johnson repeatedly used IBM resources and facilities to prepare presentations to potential JSJ investors.  Among other marketing promises that Mr. Johnson made was a claim that he would be able to recruit at least one additional IBM executive to leave IBM for this venture if the necessary funding were attained.  Those presentations also described "a strong pipeline of proprietary deal flow, a research centric methodology to identify and understand emerging product/market opportunities", as well as "technology experience and insights, technology investments, technology operations and M&A transactions".  All knowledge of Mr. Johnson pertaining to such matters was gained by him through his employment by IBM.

45.    Upon information and belief, Mr. Johnson also used an IBM funded trip to the Middle East in an effort to cultivate potential investors for JSJ.

46.    Upon information and belief, Mr. Johnson contemplated the use of contacts made during that trip to the Middle East during IBM-sponsored meetings to develop further sources of funding for JSJ.

47.     Mr. Johnson never disclosed his efforts to establish JSJ to IBM, nor did he disclose the fact that he was using IBM resources, facilities and personnel for his own personal financial interests.

48.     Mr. Johnson's use of IBM resources was a clear violation of IBM's Business Conduct Guidelines ("BCGs"), which Mr. Johnson repeatedly certified he would follow as part of his continued employment by IBM.

49.     Mr. Johnson's work on behalf of JSJ also constituted a flagrant conflict of interest. Many of the emerging areas in the technology sector that were identified in JSJ presentation materials as potential targets for investment were the very same areas that Mr. Johnson identified in his own internal IBM self-evaluation as key areas with respect to which he was leading significant strategic initiatives on IBM's behalf.

50.     Mr. Johnson's denial that he possesses IBM trade secrets or other proprietary information, his efforts to evade his other legal responsibilities to IBM and his prior disregard of IBM's property interests and standards of conduct show that there is a grave risk of disclosure of IBM's trade secrets and other proprietary information if Mr. Johnson is permitted to assume a senior post at Dell.

51.     In addition, Mr. Johnson has engaged in a pattern of activity whereby, among other things, he misled his superiors about activities, secretly undertaken on his own behalf, misrepresented the nature and scope of his planned activities at Dell, misrepresented the nature and scope of competition between IBM and Dell and has demonstrated a deliberate intent to violate his contractual and legal obligations to IBM.

## COUNT I — Breach of Noncompetition Agreement

52.     IBM repeats and realleges as though fully set forth herein the allegations of Paragraphs 1 through 50 of the Complaint as Paragraph 51 of Count I above.

53.     The Noncompetition Agreement is an enforceable agreement that imposes upon Mr. Johnson certain contractual obligations.

54.     Mr. Johnson intends to and has breached the terms of his Noncompetition Agreement by, among other things, accepting employment with Dell.

55.     If Mr. Johnson is not enjoined from working for Dell, thereby violating his Noncompetition Agreement, IBM will be irreparably injured.

56.     If Mr. Johnson is not enjoined from violating the nonsolicitation covenants, IBM will be irreparably harmed.

## COUNT II — Misappropriation of Trade Secrets

57.     IBM repeats and realleges as though fully set forth herein the allegations of Paragraphs 1 through 51 of the Complaint as Paragraph 57 of Count II above.

58.     IBM possesses certain trade secrets and confidential information with which Mr. Johnson is familiar and which Mr. Johnson has a common law duty not to disclose outside of IBM.

59.     Mr. Johnson, as long as he is employed by Dell, will inevitably use and/or disclose IBM trade secrets for his own benefit and for the benefit of Dell.

60.     As an unavoidable result of Mr. Johnson's impending misappropriation of IBM trade secrets, IBM will be irreparably harmed.

## COUNT III — Breach of Contract

61.     IBM repeats and realleges as though fully set forth herein the allegations of Paragraphs 1 through 51 of the Complaint as Paragraph 61 of Count III above.

62.     The programs under which Mr. Johnson received substantial awards of equity-based compensation are enforceable agreements that impose upon Mr. Johnson certain contractual obligations, including the obligation to refrain from working for a competitor.

63.     By accepting employment at Dell, Mr. Johnson has breached his obligations under IBM's equity-based compensation programs.

64.     IBM has been damaged thereby and is entitled to the return of previously paid equity compensation.

## COUNT IV – Breach of Duty

65.     IBM repeats and realleges as though fully set forth herein the allegations of Paragraphs 1 through 51 of the Complaint as Paragraph 65 of Count IV above.

66.     Mr. Johnson and IBM had a relationship of trust that extended beyond the terms of any contract between them.  Johnson was one of IBM's most senior executives, and IBM entrusted him with its most highly sensitive strategic information on the mutual understanding that he would use this information in furtherance of IBM's business interests.

67.     Mr. Johnson was also one of IBM's chief negotiators with respect to IBM's potential acquisition targets, buyers, clients, and investors.  Mr. Johnson therefore owed a fiduciary duty to IBM to always act in good faith and in the interests of IBM.

68.     Mr. Johnson's duplicitous execution of his Noncompetition Agreement with IBM violated his duty of good faith to IBM.

69.     Mr. Johnson's efforts to develop a technology-focused private venture, which involved exploiting IBM employees, assets, and business networks for his personal gain for a period of at least four years, amount to a material and substantial breach of his fiduciary duty to IBM.

70.     Mr. Johnson exploited IBM's business networks and connections for his private venture, impairing his ability to act loyally and in good faith as one of IBM's chief negotiators.

71.     Mr. Johnson touted his access to IBM's trade secrets.  His betrayal of IBM's trust and confidence adversely affected his job performance, impairing his ability to maintain the confidentiality of IBM's proprietary information and directly conflicting with his obligations to IBM.

72.     IBM is entitled to the return of all compensation paid to Mr. Johnson during his period of disloyalty, which reaches at least as far back as 2005 and potentially farther.

WHEREFORE, plaintiff demands judgment against defendant as follows:

A.     Imposing preliminary and permanent injunctive relief ordering Mr. Johnson to refrain from:

(a)     breaching the terms of his Noncompetition Agreement with IBM;

(b)     engaging in any employment arrangement with Dell in violation of IBM's rights under the Noncompetition Agreement;

(c)     disclosing, divulging, furnishing, using or making accessible to anyone any knowledge or information of a confidential or proprietary nature with respect to any of IBM's trade secrets, proprietary business information, strategies or plans, or other proprietary information, tools and data, and from misappropriating trade secrets and other confidential or proprietary information of IBM;

(d)     engaging in any employment arrangement with Dell, which will inevitably cause improper use and/or disclosure of IBM's trade secrets and proprietary information.

B.     Awarding IBM's attorneys' fees, costs and disbursements incurred as a result of this action;

-13-

C.     Awarding IBM damages in an amount to be proved at trial; and

D.     Awarding IBM such further relief as the Court deems just and proper.

June 24, 2009

CRAVATH, SWAINE & MOORE LLP

by_____

Evan R. Chesler
(EChesler@Cravath.com)
Stephen S. Madsen
(SMadsen@Cravath.com)
Members of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Plaintiff International Business Machines Corporation*

-14-

**Exhibit 1**

## NONCOMPETITION AGREEMENT

As consideration for the awards granted to you on March 8, 2005, under an IBM Long-Term Performance Plan ("LTPP") and for other good and valuable consideration, you, ("Employee" or "you") hereby agree to the terms and conditions of this Noncompetition Agreement (this "Agreement") as follows:

1.   **Covenants.**

(a)   You acknowledge and agree that: (i) the business in which IBM and its affiliates (collectively, the "Company") are engaged is intensely competitive and that your employment by IBM has required, and will continue to require, that you have access to, and knowledge of, confidential information of the Company, including, but not limited to, certain or all of the Company's methods, information, systems, plans for acquisition or disposition of products, expansion plans, financial status and plans, customer lists, client data, personnel information and trade secrets of the Company, all of which are of vital importance to the success of the Company's business (collectively, "Confidential Information"); (ii) the disclosure of any of the foregoing could place the Company at a serious competitive disadvantage and could do serious damage, financial and otherwise, to the business of the Company; (iii) you have been given access to, and developed relationships with, customers of the Company at the time and expense of the Company; and (iv) by your training, experience and expertise, your services to the Company are, and will continue to be, extraordinary, special and unique.

(b)    You acknowledge and agree that during your employment with IBM and for one (1) year following the termination of your employment either by you for any reason, by IBM for "Cause," or by IBM without Cause where IBM elects, pursuant to Paragraph 4 below, to make certain severance payments to you, you will not directly or indirectly within the "Restricted Area" (i) "Engage in or Associate with" (a) any "Business Enterprise" or (b) any significant competitor or major competitor of the Company; or (ii) solicit, for competitive business purposes, any customer of the Company with which you were involved as part of your job responsibilities during the last twelve (12) months of your employment with the Company.  You further agree that, for the two (2) year period following the termination of your employment by either you or by IBM for any reason, you will not directly or indirectly within the "Restricted Area," hire, solicit or make an offer to any employee of the Company to be employed or perform services outside of the Company.

2.    **Definitions.**

(a)    For purposes of this Agreement, the term "Business Enterprise" shall mean any entity that engages in, or owns or controls a significant interest in any entity that engages in, competition with the business units or divisions of the Company in which you worked at any time during the two (2) year period prior to the termination of your employment.

(b)    For purposes of this Agreement, "Cause" shall mean, as reasonably determined by IBM, the occurrence of any of the following: (i) embezzlement, misappropriation of corporate funds or other material acts of dishonesty; (ii) commission or conviction of

2

any felony, or of any misdemeanor involving moral turpitude, or entry of a plea of guilty or <u>nolo contendere</u> to any felony or misdemeanor (other than a minor traffic violation or other minor infraction); (iii) engagement in any activity that you know or should know could harm the business or reputation of the Company; (iv) material failure to adhere to the Company's corporate codes, policies or procedures; (v) a breach of any covenant in your employment agreement or any intellectual property agreement, or a material breach of any other provision of your employment agreement, in either case if the breach is not cured to the Company's satisfaction within a reasonable period after you are provided with notice of the breach (no notice and cure period is required if the breach cannot be cured), <u>provided, however,</u> that the mere failure to achieve performance objectives shall not constitute Cause; (vi) failure by you to substantially perform your duties or follow management direction, which failure is not cured to the Company's satisfaction within a reasonable period of time after a written demand for substantial performance is delivered to you (no notice or cure period is required if the failure to perform cannot be cured); or (vii) violation of any statutory, contractual or common law duty or obligation to the Company, including without limitation the duty of loyalty.

(c)    For purposes of this Agreement, the phrase "<u>Engage in or Associate with</u>" shall include without limitation engagement or association as a sole proprietor, owner, employer, director, partner, principal, investor, joint venturer, shareholder, associate, employee, member, consultant, contractor or otherwise.

(d)    For purposes of this Agreement, the term "<u>Restricted Area</u>" shall mean any geographic area in

3

the world for which you had job responsibilities during the last twelve (12) months of your employment with the Company.

3. **Acknowledgements**. You acknowledge that the Company would suffer irreparable harm if you fail to comply with Paragraph 1, and that the Company would be entitled to any appropriate relief, including money damages, equitable relief and attorneys' fees. You further acknowledge that enforcement of the covenants in Paragraph 1 is necessary to ensure the protection and continuity of the business and goodwill of the Company and that, due to the proprietary nature of the business of the Company, the restrictions set forth in Paragraph 1 are reasonable as to geography, duration and scope.

4. **Termination without Cause**. In the event that IBM terminates your employment without Cause, IBM may elect in its sole discretion to pay to you severance payments (in an amount and on terms that IBM will determine, and disclose to you, prior to your termination of employment) in accordance with IBM's regular payroll practices and subject to all applicable foreign, federal, state and local withholdings or other taxes that IBM may from time to time be required to withhold. Without limiting the generality of the foregoing, IBM may cease making such payments under this Paragraph 4 if IBM believes that you are in breach of any of your obligations in this Agreement. Without prejudice to any other remedies under this Agreement or under applicable law, the Company may also seek to recoup any payments made to you under this Paragraph 4 if you breach any of your obligations under this Agreement.

4

5.    **LTPP Awards.**   For purposes of the LTPPs and any awards thereunder (including any awards outstanding on the date of this Agreement) (collectively, the "LTPP Awards"), if you engage in conduct in breach of this Agreement prior to, or within twelve (12) months after, any delivery or payout pursuant to any LTPP Awards, then such conduct shall also be deemed to be a breach of the terms of such LTPP Awards, justifying cancellation or rescission of any such LTPP Awards.

6.    **Injunctive Relief.**  You agree that the Company would suffer irreparable harm if you were to breach, or threaten to breach, any provision of this Agreement and that the Company would by reason of such breach, or threatened breach, be entitled to injunctive relief in a court of appropriate jurisdiction, without the need to post any bond, and you further consent and stipulate to the entry of such injunctive relief in such a court prohibiting you from breaching this Agreement. This Paragraph 6 shall not, however, diminish the right of the Company to claim and recover damages in addition to injunctive relief.

7.    **Severability.**  In the event that any one or more of the provisions of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.  Moreover, if any one or more of the provisions contained in this Agreement shall be held to be excessively broad as to duration, activity or subject, such provisions shall be construed by limiting and reducing them so as to be enforceable to the maximum extent allowed by applicable law.  Furthermore, a determination in any jurisdiction that this Agreement, in whole or in part, is invalid,

5

illegal or unenforceable shall not in any way affect or impair the validity, legality or enforceability of this Agreement in any other jurisdiction.

      8.    <u>Captions</u>. The captions in this Agreement are inserted for convenience and reference only and shall in no way affect, define, limit or describe the scope, intent or construction of any provision hereof.

      9.    <u>Waiver</u>. The failure of the Company to enforce any terms, provisions or covenants of this Agreement shall not be construed as a waiver of the same or of the right of the Company to enforce the same. Waiver by the Company of any breach or default by you (or by any other employee or former employee of the Company) of any term or provision of this Agreement (or any similar agreement between the Company and you or any other employee or former employee of the Company) shall not operate as a waiver of any other breach or default.

      10.   <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and be binding upon the Company, any successor organization which shall succeed to the Company by acquisition, merger, consolidation or operation of law, or by acquisition of assets of the Company and any assigns. You may not assign your obligations under this Agreement.

      11.   <u>No Oral Modification</u>. This Agreement may not be changed orally, but may be changed only in a writing signed by the Employee and a duly authorized representative of IBM.

      12.   <u>Entire Agreement</u>. Although this Agreement sets forth the entire understanding between the Employee and the Company concerning its subject matter, this

6

** TOTAL PAGE.08 **

Agreement does not impair, diminish, restrict or waive any other restrictive covenant, nondisclosure obligation or confidentiality obligation of the Employee to the Company under any other agreement, policy, plan or program of the Company. The Employee and IBM represent that, in executing this Agreement, the Employee and IBM have not relied upon any representations or statements made, other than those set forth herein, with regard to the subject matter, basis or effect of this Agreement.

13.   **Governing Law**. This Agreement and any disputes between the Employee and the Company shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to its conflict of law rules. The Employee consents to the exclusive jurisdiction and venue in the federal and state courts of the State of New York, County of Westchester, for the resolution of all disputes arising under, or relating to, this Agreement.

_____

Name:

Date:

INTERNATIONAL BUSINESS
MACHINES CORPORATION

By: _____

Name: David Johnson

Title: VP Corporate Development

7

**Exhibit 2**



**IBM** **Agreement Regarding Confidential Information and Intellectual Property**

In consideration of my employment by IBM or my continued employment at will by IBM, and the payment to me of the salary or other compensation that I shall receive during my employment, I agree as follows:

1. I will not, without IBM's prior written permission, disclose to anyone outside of IBM or use in other than IBM's business, either during or after my employment, any confidential information or material of IBM or its subsidiaries, or any information or material received in confidence from third parties by IBM or its subsidiaries. If I leave the employ of IBM, I will return all IBM property in my possession, including all confidential information or material such as drawings, notebooks, reports, and other documents.

   Confidential information or material of IBM or its subsidiaries is any information or material:
   (a) generated or collected by or utilized in the operations of IBM or its subsidiaries that relates to the actual or anticipated business or research and development of IBM or its subsidiaries; or
   (b) suggested by or resulting from any task assigned to me or work performed by me for or on behalf of IBM;
   and which has not been made available generally to the public.

2. I will not disclose to IBM, use in IBM's business, or cause IBM to use, any information or material which is confidential to others.

3. I will comply, and do all things necessary for IBM and its subsidiaries to comply, with the laws and regulations of all governments under which IBM does business, and with provisions of contracts between any such government or its contractors and IBM or its subsidiaries that relate to intellectual property or to the safeguarding of information.

4. I hereby assign to IBM my entire right, title and interest in any idea, invention, design of a useful article (whether the design is ornamental or otherwise), computer program and related documentation, and other work of authorship (all hereinafter called "Developments"), hereafter made or conceived solely or jointly by me, or written wholly or in part by me, whether or not such Developments are patentable, copyrightable or susceptible to other forms of protection, and the Developments:
   (a) relate to the actual or anticipated business or research or development of IBM or its subsidiaries; or
   (b) are suggested by or result from any task assigned to me or work performed by me for or on behalf of IBM.

   In the case of any "other work of authorship," such assignment shall be limited to those works of authorship which meet both conditions (a) and (b) above.

   The above provisions concerning assignment of Developments apply only while I am employed by IBM in an executive, managerial, product or technical planning, technical, research, programming or engineering capacity (including development, product, manufacturing, systems, applied science, and field engineering). Excluded are any Developments that I cannot assign to IBM because of prior agreement with

   _____ which is effective until

   _____ (Give name and date or write "none").

   I acknowledge that the copyright and any other intellectual property right in designs, computer programs and related documentation, and works of authorship, created within the scope of my employment, belong to IBM by operation of law.

5. In connection with any of the Developments assigned by Paragraph 4:
   (a) I will promptly disclose them to IBM Patent Operations or IBM management as appropriate; and
   (b) I will, on IBM's request, promptly execute a specific assignment of title to IBM, and do anything else reasonably necessary to enable IBM to secure a patent, copyright or other form of protection therefor in the United States and in other countries.

6. IBM and its subsidiaries and their licensees (direct and indirect) are not required to designate me as author of any design, computer program or related documentation, or other work of authorship assigned in Paragraph 4 when distributed publicly or otherwise, nor to make any distribution. I waive and release, to the extent permitted by law, all my rights to the foregoing.

7. I have identified on the back hereof all Developments not assigned by Paragraph 4 in which I have any right, title or interest, and which were previously made or conceived solely or jointly by me, or written wholly or in part by me, but neither published nor filed in any patent office.

   If I do not have any to identify, I have written "none" on this line: _____ None _____
   (It is in your interest to establish that any of the above were made, conceived or written before your employment by IBM. You should not disclose them but, identify them only by the titles and dates of documents describing them. If you wish to interest IBM in any of them, you may contact External Submissions at Corporate Headquarters, which will provide you with instructions for submitting them to IBM.)

ZM04-3097-5 (U/M-001)
(Rev. 6/80)

**PERSONNEL FOLDER**

8. The term "subsidiaries," as used in this Agreement, includes any entity owned or controlled, directly or indirectly, by IBM.

9. With respect to the subject matter thereof, this is my entire agreement with IBM, and it supersedes (to the extent enforceable) all previous oral or written communications, representations, understandings, undertakings, or agreements by or with IBM.

10. I acknowledge receipt of a copy of this Agreement.

Signed: _____         Employee's Serial: _979990_   Date: _3/17/91_
                Employee's Full Name

IBM Representative: _____                                Date: _3/17/91_
                Employee's Manager or other
                appropriate IBM Representative

*(If you have entered "none" in Paragraph 7, do not fill in this section.)*

The following are Developments not covered by Paragraph 4, in which I have any right, title or interest, and which were previously conceived or written either wholly or in part by me, but neither published nor filed in any Patent Office:

Description of Documents (if applicable):

| Title on Document | Date on Document | Name of Witness on Document |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | | _____ |

Signed: _____
                Employee's Full Name

Date: _____

HIGHLY CONFIDENTIAL