UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | : | |
| | : | |
| | : | |
| Plaintiff, | : | 09 Civ. 4826 (SCR) |
| | : | |
| *v.* | : | |
| | : | MEMORANDUM DECISION |
| DAVID L. JOHNSON, | : | AND ORDER |
| | : | |
| Defendant. | : | |

_____

**STEPHEN C. ROBINSON, United States District Judge.**

International Business Machines Corporation ("IBM" or the "Company") commenced this diversity action against David L. Johnson, formerly IBM's Vice-President of Corporate Development, asserting claims for breach of a non-competition agreement and misappropriation of trade secrets. On June 1, 2009, IBM sought a preliminary injunction enjoining Mr. Johnson from violating the purported non-competition agreement and from continuing his employment as Senior Vice President of Strategy at Dell Inc. ("Dell"), a competitor of IBM. At a hearing before Judge Kenneth M. Karas, to whom this action was assigned originally, doubt was raised as to whether the alleged non-competition agreement had been duly executed by Mr. Johnson. As a result, Judge Karas scheduled a preliminary injunction hearing for June 22, 2009, to permit the parties to engage in expedited discovery and file legal memoranda on New York contract law. Judge Karas also permitted Mr. Johnson to commence his employment at Dell but restricted him from advising Dell on any matter concerning the business strategy of Dell or IBM and enjoined him from disclosing any of IBM's confidential information in his possession. Subsequently, the

case was transferred to this Court, which held the preliminary injunction hearing on June 22, 2009.[1]

For the reasons set forth in this opinion, the Court denies IBM's request for a preliminary injunction.

# I

# BACKGROUND

The following recitation of the facts is based upon the affidavits, submitted in lieu of live direct testimony, of Mr. Johnson, J. Randall MacDonald,[2] and other witnesses; the in-court cross-examination and re-direct examination of those witnesses; and the exhibits received into evidence during the June 22, 2009, hearing.[3]

Until his resignation a few weeks ago, Mr. Johnson had worked for IBM for more than twenty-seven years.  For the last nine years, he held the position of Vice President of Corporate Development, reporting directly to Mark Loughridge, IBM's Senior Vice President and Chief Financial Officer.  In that capacity, Mr. Johnson directed IBM's mergers, acquisitions, and divestitures strategy, and, according to IBM, he possesses IBM's most sensitive confidential strategic information.  During his tenure at IBM, Mr. Johnson was a member of IBM's

---

[1]  IBM has since filed an Amended Complaint, adding causes of action for breach of contract and breach of fiduciary duty.  Amended Complaint ("Am. Compl.") ¶ 61-72.

[2]  MacDonald is currently employed by IBM as its Senior Vice President of Human Resources, and he was IBM's designee, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, to discuss the circumstances surrounding Mr. Johnson's non-competition agreement.  Despite being so designated, MacDonald testified that, at the time that he drafted his affidavit, he had not been shown numerous IBM documents related to the Company's handling of Mr. Johnson's non-competition agreement, particularly those supporting Mr. Johnson's position. Preliminary Injunction Hearing Transcript ("Prelim. Inj. Hr'g Tr.") 72-78, June 22, 2009; *see also infra note* 12.

[3]  FED. R. CIV. P. 65(a)(2) ("Even when consolidation is not ordered, evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial.  But the court must preserve any party's right to a jury trial.").

Integration & Values Team ("IVT"), a group composed of IBM's 300 most senior managers.[4]

The IVT is charged with developing IBM's corporate strategy and driving the Company's

innovation and growth.  As an IVT member, IBM contends, Mr. Johnson gained access to

confidential information concerning the Company's strategic plans, marketing plans, and long-

term business opportunities, including information regarding the development status of specific

IBM products.

In 2005, IBM began requiring its most senior executives, including Mr. Johnson, to

execute non-competition agreements.  In consideration for the promise not to compete,[5]

employees were eligible to continue qualifying for certain equity grants—grants that they had

qualified to receive before the implementation of the non-compete regime.  Mr. Johnson received

the form non-competition agreement in March 2005, and IBM asked him to execute the

agreement and return it within a few months.

By May 2005, Mr. Johnson had yet to execute the agreement, and he received an e-mail

from MacDonald.  The e-mail explained that Mr. Johnson's agreement had not yet been received

by IBM and warned him that his 2005 equity award would not take effect until the non-

competition agreement was signed and received.  MacDonald's e-mail also notified Mr. Johnson

that IBM had set a deadline of June 1, 2005, for return of the executed non-competition

agreement.

Mr. Johnson nevertheless was reluctant to enter into a non-competition agreement with

IBM.  In 2001, Mr. Johnson had foregone an opportunity to become the chief executive officer

of another technology company based upon assurances that he would be considered for a

---

[4]  The IVT was the successor group to the Senior Leadership Team ("SLT"), of which Mr. Johnson became a member in 1996.

[5]  The agreements provided for a one-year term of non-competition and world-wide geographic scope. Second Supplemental Declaration of J. Randall MacDonald ("MacDonald Decl.") Exh. 4 at ¶¶ 1(b), 2(d).

promotion to a General Manager position at IBM within two years.  In 2004, Mr. Johnson had

approached Loughridge, IBM's CFO, who assured Mr. Johnson that he would be considered for

a General Manger position.  Loughridge prepared an Annual Development Plan for Mr. Johnson

in September 2004, which indicated that Mr. Johnson's next position would be in General

Management.

Despite the representations of Loughridge and other IBM executives, Mr. Johnson was

concerned that his growth possibilities at IBM were limited.  Mr. Johnson therefore contacted

Randy MacDonald and asked him whether IBM would consider him for a General Manager

position.  MacDonald told Mr. Johnson that he would look into the matter and get back to him by

the *end* of June 2005.

IBM, however, had set a June 1, 2005, deadline for return of the executed non-

competition agreement.  Thus, in an effort to extend the time during which he could consider

whether to enter into such an agreement, Mr. Johnson purposefully signed the non-competition

agreement on the signature block designated for IBM.[6]  Mr. Johnson—who, in this Court's view,

was an extremely credible and reasonable witness—testified that he believed that the act of

signing the agreement on the signature block designated for IBM would prevent the agreement

---

[6] The following signature blocks appear immediately below the last paragraph of the non-competition
agreement:

_____

Name:
Date:

INTERNATIONAL BUSINES
MACHINE CORPORATION
By:_____
Name:
Title:

MacDonald Decl. Exh. 4 at 7.

from being valid and would allow him more time to decide whether to commit to a non-competition agreement with IBM.

Mr. Johnson's gambit appears to have worked just as he envisioned.  In the Fall of 2005, IBM returned to Mr. Johnson the original version of the improperly signed agreement and told him that his signature was on the wrong line.  Randy MacDonald testified that he was the IBM executive in the United States designated to sign the non-competition agreements and the executive with final responsibility for binding the company to non-competition agreements. MacDonald testified that he had signed hundreds of other non-competition agreements on IBM's behalf, but he never signed Mr. Johnson's agreement.  Concurrent with its return of the original, improperly signed agreement, IBM sent to Mr. Johnson a blank agreement and asked him to execute and return it.

Around the same time, Loughridge initiated a discussion with Mr. Johnson regarding the General Manager position.  Loughridge explained to Mr. Johnson that he did not see Mr. Johnson as a General Manager and expressed shock that Mr. Johnson wanted to move into that position.  According to Loughridge, finance people at IBM never moved into General Manager positions.  Mr. Johnson reminded Loughridge about the conversation that he had had with Loughridge in 2004, and other IBM executives in 2001, regarding his desire to move into a General Manager position.  Mr. Johnson testified that Loughridge had indicated that these conversations never occurred and then stated that he was offended that Mr. Johnson suggested otherwise.

Thereafter, Mr. Johnson was not willing to enter into the non-competition agreement, and he refused to sign the blank agreement that IBM had sent to him.  Mr. Johnson testified that, over the next year, personnel from IBM's Human Resources Department regularly called his office

and sent him e-mails asking that he sign and return the non-competition agreement.  Indeed, in

February 15, 2006, Teri Wood, Staff Counsel to the Human Resources Law Group, wrote an e-

mail to Barbara Brickmeier, Vice President of Human Resources, explaining that Mr. Johnson

had "still not signed his non-compete on the employee line."  Def. Exh. 1 at 1.  Deb Cannone, a

paralegal who was copied on the e-mail exchange between Wood and Brickmeier, handwrote the

following on a printed copy of the e-mail:  "Dave Johnson signed on Corporate line.  When

asked to resign on employee line, he refused."  *Id.*

On May 10, 2006, Donna Riley, Vice President of Human Resources, wrote an e-mail to

Mr. Johnson stating:  "Hi Dave.  A while ago we had talked about the need for you to re-sign the

standard non-compete agreement for SLT members since your original had been signed on the

wrong line.  We are about to go through an update for new I&VT members, so you will receive a

fresh copy of the agreement that you can sign and return during that cycle."  Def. Exh. 2 at 1.

Still several months later, on July 18, 2006, Riley again wrote to Mr. Johnson:

> Hi Dave.  Hate to be a pest, but we're *still working on getting all of
> the non-compete agreements signed and filed and yours isn't
> booked since the original was signed in the wrong place.*  I'm
> asking my team to have a hard copy put in your mail today since
> anyone who hasn't returned theirs to Chris Gregory in North Castle
> by the end of Friday *will receive a personal call from Randy
> regarding the status of their equity grant.*

Def. Exh. 4 at 1 (emphasis added).  Despite this threat of sorts and despite continuing to refuse to

sign the non-competition agreement, Mr. Johnson testified that he never received a subsequent

call from MacDonald or any other IBM employee regarding the status of his equity grants.

Mr. Johnson also testified that he discussed his improper signature of the non-

competition agreement with Don Rosenberg, IBM's General Counsel.  During this conversation

Mr. Johnson told Rosenberg that he purposefully had signed on the wrong line and that he

thought that meant that the agreement was not binding.  According to Mr. Johnson, Rosenberg expressed doubts about whether this was the case.  Mr. Johnson then told Rosenberg that IBM employees had pursued him to sign another version of the agreement.  Rosenberg's eyebrows went up—a signal that, according to Mr. Johnson, conveyed the meaning that Rosenberg did not believe that the agreement was binding—and he (Rosenberg) told Mr. Johnson to "save the documentation to demonstrate that there had been repeated efforts where [Mr. Johnson] didn't respond."  Preliminary Injunction Hearing Transcript ("Prelim. Inj. Hr'g Tr.") 28-31, June 22, 2009.

On September 15, 2006, Cannone sent an e-mail to Margaret Sohr, who was working with Reily on the administrative aspects of booking the non-competition agreements, informing her that Mr. Johnson's agreement was among those still outstanding.  Cannone's e-mail explained that Mr. Johnson "*did not sign* last year and you sent him another [20]05 [agreement] to sign."  Def. Exh. 7 at 1 (emphasis supplied).  In the same e-mail, she noted that another employee "had signed in the wrong place."  *Id.*

According to IBM's internal protocols for handling non-competition agreements, when an employee signed the agreement, it then had to "be signed by Randy MacDonald or an appropriate country representative, as designated by Legal."  Def. Exh. 24 at 1.  After MacDonald's signature, the Company's protocols required that "the original signed versions of the [non-competition agreements] [be] sent to Deb Cannone of the [Human Resources Legal Group].  The HRLG [would] maintain the original versions of the agreements."  *Id.* at 2.  IBM obviously did not follow these protocols with Mr. Johnson's non-competition agreement.  Neither MacDonald nor any other IBM representative signed the agreement, and IBM did not retain an original copy of the agreement.

Despite not having properly signed the non-competition agreement, Mr. Johnson received yearly equity awards from 2005 through 2008—awards which he had been receiving annually from IBM since 1992.  In order to accept the awards for 2005 and 2006, Mr. Johnson had to complete an electronic equity award acceptance form containing the following language:

> IBM's grant to you of stock options and the Long-Term Investment Program Award (the "LTIP Award") *are not effective until, and are conditioned upon* (1) your accepting the terms and conditions of the award agreements and the Long-Term Performance Plan ("LTPP") under which these equity awards are granted, including those provisions relating to the cancellation and rescission of awards **and** (2) your agreeing to the terms and conditions of the Noncompetition Agreement, which you have received under a separate cover. . . .
>
> . . . .
>
> . . . By pressing the ACCEPT button, you also agree that the grant of these awards by IBM is subject to the condition that, and *your acceptance of such awards is not effective until*, you agree to the terms and conditions of the Noncompetition Agreement by signing and returning the agreement as directed.

Def. Exh. 15 at 1 (bolding in original; italicization supplied); *see also* Def. Exh. 15 at 3. MacDonald was the executive at IBM with the authority to rescind equity awards due to an employee's failure to execute and return a non-competition agreement, and he also had the discretion not to rescind the awards despite an employee's failure to do so.  *See* Def. Exh. 22 at 1-2; Prelim. Inj. Hr'g Tr. 56.

Mr. Johnson received the 2005 award on March 8, 2005, approximately two months before the non-competition agreement was due, and he received the 2006 award on May 8, 2006, almost one-year since he had submitted the improperly executed agreement.  By 2007 and 2008, however, IBM had dropped the language conditioning acceptance of the equity awards on the employee's execution of the non-competition agreement.

In late 2008, a recruiter contacted Mr. Johnson concerning an employment opportunity at Dell.  After several rounds of negotiations, Mr. Johnson agreed to join Dell as Senior Vice President of Strategy.  In that capacity, Mr. Johnson will help Dell set a strategic vision, mission, and goals based upon its existing resources and internal capabilities.

IBM contends that it will suffer irreparable harm should the Court not enjoin Mr. Johnson from violating the purported non-competition agreement.  According to IBM, Mr. Johnson is aware of IBM's past, present, and future business strategies and all acquisitions, transactions, and divestitures that IBM is considering.  Because of his work as head of IBM's Corporate Development group, Mr. Johnson knows IBM's strategies for growth, and its method of evaluating future business needs and companies as candidates for acquisition.  In addition, IBM contends that Mr. Johnson is aware of IBM's assessment of its clients' needs, its competitors' strategies, its opportunities, and its own strategies for carrying out its business objectives.  Mr. Johnson knows in which areas, companies, and technologies IBM will invest, at what times, and with what expected rates of return.  Statements by Michael Dell, IBM notes, demonstrate that Dell intends to expand its presence in the server, storage, and enterprise areas—three areas in which IBM and Dell compete and about which Mr. Johnson has confidential information. Finally, Dell will pay Mr. Johnson his full salary—well over $1 million—even if Mr. Johnson is forced to comply with the purported non-competition agreement.

Mr. Johnson disputes IBM's contention that he possesses a great deal of IBM's confidential information or trade secrets.  For example, Mr. Johnson notes that as a member of the IVT, he attended only thirteen meetings between 1996 and January 2009, and he does not recall any IVT meeting focusing on IBM's competitors, development plans for unannounced products or trade secret information regarding hardware, software, or services.  Mr. Johnson also

explains that he never attended the meetings of the Technology Committee, which is the forum for internal discussions about IBM's research and development.  According to Mr. Johnson, his ability to identify potential acquisitions was not based on IBM's confidential or proprietary information, but rather on analyses of other companies from publicly available sources.

Furthermore, Mr. Johnson believes that he would suffer great hardship should the Court enforce, what he characterizes as, the invalid non-competition agreement.  Mr. Johnson explains that the nature of his qualifications and skills requires that he deal with information that changes rapidly and requires constant attention.  If he is not in a position to monitor the external factors that guide and mold the technology industry—through access to daily reports, surveys, and analyses conducted industry-wide—he believes that his skill set will quickly become obsolete. Finally, Mr. Johnson has developed a large personal network of investment bankers, consulting groups, and chief information officers with whom he risks losing touch without a formal position in the technology industry.

# II

## DISCUSSION

The Court begins with the legal standards governing the issuance of a preliminary injunction—"one of the most drastic tools in the arsenal of judicial remedies."  *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985).

Within the Court of Appeals for the Second Circuit, a party seeking a preliminary injunction[7] generally must establish two elements:  (1) the likelihood of irreparable injury in the

---

[7]  A typical preliminary injunction is prohibitory, and it seeks to maintain the status quo pending a trial on the merits.   If the preliminary injunction seeks to "alter the status quo by commanding some positive act," however, it is a mandatory injunction. *Tom Dohert Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995).  Parties seeking to obtain a mandatory injunction must satisfy a more burdensome test.  A mandatory injunction should

absence of an order or injunction; and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships "tipping decidedly" in the movant's favor. *Fed. Express Corp. v. Fed. Expresso, Inc.*, 201 F.3d 168, 173 (2d Cir. 2000); *see also Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008). *But see Winter v. Nat'l Res. Def. Council*, --- U.S. --- , 129 S. Ct. 365, 374 (2008).[8]

The Second Circuit has defined "irreparable harm" as "an injury that is not remote or speculative but actual and imminent, and 'for which a monetary award cannot be adequate compensation.'" *Tom Dohert Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)). Also falling within the ambit of "irreparable harm" are situations in which "there is a threatened imminent loss that will be very difficult to quantify at trial." *Id.* at 38. "This rule is necessary," the Second Circuit has reasoned, "to avoid the unfairness of denying an injunction to a plaintiff on the ground that money damages are available, only to confront the plaintiff at trial on the merits with the rule that damages must be based on more than speculation." *Id.*

Moreover, where an applicant for a preliminary injunction cannot establish a likelihood of success on the merits, a court nevertheless may grant injunctive relief if it determines that the applicant "has raised questions going to the merits so serious, substantial, difficult, and doubtful,

---

issue, the Second Circuit has explained, "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Id.* (internal quotation marks and citation omitted). Mr. Johnson contends that any injunctive order issued in this case would alter the status quo because he has already begun working at Dell. This argument is flawed because it fails to take into account Judge Karas' Order of June 4, 2009, which placed severe restrictions on Mr. Johnson's work at Dell and which was meant to preserve the status quo. Indeed, on the date that Judge Karas issued his Order, Mr. Johnson still was an employee of IBM. *See* Transcript of Temporary Restraining Order Hearing 25-26, June 1, 2009.

[8] In *Winter*, the Supreme Court explained that "[a] plaintiff seeking a preliminary injunction *must establish that he is likely to succeed on the merits*, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." 129 S. Ct. at 374 (emphasis supplied). *Winter*, and its effect on the Second Circuit's standard, is discussed in more detail in section II.C., *infra*.

as to make them a fair ground for litigation and thus for more deliberate investigation."

*Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953).  This is a less

rigorous and more lenient standard, *Sweeny v. Bane*, 996 F.2d 1384, 1388 (2d Cir. 1993), and

therefore it requires that the applicant establish that the harm which it would suffer is

"'decidedly' greater" than the harm his opponent would suffer.  *Buffalo Forge Co. v. Ampco-*

*Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir. 1981) (quoting *Buffalo Courier-Express, Inc. v.*

*Buffalo Evening News, Inc.*, 601 F.2d 48, 58 (2d Cir. 1979)).  "The decision to grant or to deny a

preliminary injunction," the Second Circuit has explained, "depends in part on a flexible

interplay" between these two factors, and therefore they ought not be considered in isolation.

*See Packard Instrument Co. v. ANS, Inc.*, 416 F.2d 943, 945 (2d Cir. 1969).

Regardless of which preliminary injunction standard is applied, the Court is cognizant of

the Second Circuit's "continuing admonishments that interim injunctive relief is an

'extraordinary and drastic remedy which should not be routinely granted.'"  *Buffalo Forge Co.*,

638 F.2d at 569 (2d Cir. 1981) (quoting *Med. Soc'y of New York v. Toia*, 560 F.2d 535, 538 (2d

Cir. 1977)); *see also Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 63 (2d Cir.

2007).

## B.  Whether IBM and Mr. Johnson Entered Into a Non-Competition Agreement

IBM submits that it and Mr. Johnson entered into a binding non-competition agreement.

It points out that Mr. Johnson signed the agreement and returned it to IBM without disclosing to

anyone at the Company his motivation for signing the agreement on IBM's signature block.

According to IBM, Mr. Johnson's actions—viewed objectively—manifested assent to the non-

competition agreement.  IBM also contends that its conduct indicated that it believed that Mr.

Johnson had assented to the non-competition agreement.  IBM allowed Mr. Johnson, for example, to continue to remain eligible for, and indeed paid to him, substantial equity awards.[9]  IBM permitted Mr. Johnson continuous access to the Company's confidential information.  IBM also argues that its signature was not required to create a legally enforceable obligation because the non-competition agreement did not contain an explicit dual signature requirement.

IBM submits that even if there was no express contract created between it and Mr. Johnson, Mr. Johnson nevertheless should be equitably estopped from denying the validity of the non-competition agreement.

After setting forth the applicable principles of contract law, the Court shall return to IBM's arguments.

## 1.

The formation of a valid, express contract under New York law requires an offer, acceptance, consideration, mutual assent, and intent to be bound.  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004); *Maffea v. Ippolito*, 668 N.Y.S.2d 653, 654 (N.Y. App. Div. 1998).  There must, in other words, be "an objective meeting of the minds sufficient to give rise to a binding and enforceable contract."  *Tractelbel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 95 (2d Cir. 2007) (New York law).

Under New York law, "an acceptance 'must comply with the terms of the offer and be clear, *unambiguous and unequivocal*.'"  *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 83 (2d Cir. 1998) (quoting *King v. King*, 617 N.Y.S.2d 593, 594 (N.Y. App. Div. 1994)) (emphasis

---

[9]  On June 25, 2009, Mr. Johnson filed a number of documents suggesting that, subsequent to the filing of this action, IBM placed a permanent hold on Mr. Johnson's equity awards and arguing that such action represents an admission on IBM's behalf that it did not believe that it and Mr. Johnson had entered into a non-competition agreement.  In response, IBM contends that this hold is routine, temporary, and simply a matter of recordkeeping.  This dispute does not factor into the Court's decision to deny IBM's motion for a preliminary injunction, and therefore it need not be resolved at this point.

supplied).  Although cases often treat the requirement that an acceptance be unambiguous and

unequivocal as "identical with the requirement that an acceptance may not change, add to, or

qualify the terms of the offer," "the requirement . . . is in fact separate."  2 RICHARD A. LORD,

WILLISTON ON CONTRACTS § 6:10 (4th ed. 2004) (footnotes omitted).  "[E]ven though no change

in the offer is suggested in the reply by the offeree," one authority explains, "the reply may not

sufficiently clearly indicate assent to the offer as to create a contract."  *Id.*

Whether an acceptance is ambiguous or equivocal—that is, an acceptance that a

reasonable person could view as assent, rejection, or an invitation to bargain further, *see Topps*

*Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008)—depends *not* on the subjective,

undisclosed intent of the offeree, but rather on the offeree's words and actions as viewed from

the perspective of a reasonable person.  *See R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d

69, 74 (2d Cir. 1984) ("What matters are the parties' expressed intentions, the words and deeds

which constitute objective signs in a given set of circumstances."); *Stockland Martel, Inc. v.*

*Donald J. Pliner of Florida, Inc.*, 821 N.Y.S.2d 555, 555 (N.Y. App. Div. 2006) ("[D]efendant's

assent to the agreement . . . is not clear and unambiguous from the document itself, and resort to

extrinsic evidence is in order.").

Where an  offeree communicates to an offeror an ambiguous acceptance, it is the

offeror's reaction to that ambiguous acceptance that controls whether the parties entered into a

contract.  As Professor Samuel Williston has stated:

> [B]y their nature, equivocal responses are capable of being
> understood either as the offeree apparently intends them . . . or as
> the offeror might apparently understand them . . . .  To the extent
> that either interpretation is plausible, the offeree can hardly
> complain if the offeror understands the communication as the
> offeree apparently intended; and the offeror who reasonably treats
> an equivocal response as an acceptance may hold the offeree to a
> contract.  This rule . . . operates to protect the offeror who acts

> reasonably in relation to what it supposes is intended to operate as
> an acceptance, yet provides the offeror with significant flexibility
> as the master of the offer.  *In short, how the offeror treats the*
> *offeree's language will, assuming that treating the language either*
> *as language of acceptance or treating it as language requiring*
> *further discussion is reasonable, determine the language's effect.*

WILLISTON ON CONTRACTS, *supra*, § 6:10 (emphasis supplied); *cf. Kreiss v. McCown Deleeuw*

*& Co.*, 37 F. Supp. 2d 294, 299 (S.D.N.Y. 1999) (New York law) ("The Court of Appeals has

cautioned . . . that courts should not frustrate a party's 'forthright, reasonable signals' of his or

her intent."  (quoting *R.G. Group, Inc.*, 751 F.2d at 74); 22 N.Y. Jur. 2d *Contracts* § 29 (2009)

("Unless a person has conducted himself or herself in such a manner that his or her assent may

fairly be inferred, he or she has not contracted.").  Indeed, under New York law, courts will find

that a contract is created when the offeree engages in ambiguous conduct that leads an offeror to

believe that the offeree has assented to the deal.  *See Russell v. Raynes Associates*, 569 N.Y.S.2d

409, 414 (N.Y. App. Div. 1991).  Similarly, the Restatement (Second) of Contracts explains that

"[t]he conduct of a party is not effective as a manifestation of assent unless he intends to engage

in the conduct and knows or has reason to know that the other party may infer from his conduct

that he assents."  RESTATEMENT (SECOND) OF CONTRACTS § 19(2) (1981) [hereinafter

RESTATEMENT].  Thus, if a party "either intentionally or negligently" manifests "an appearance

of assent," then a contract is created so long as "[t]he other party . . . also manifest[s] assent."  *Id.*

§ 19(2) cmts. b-c.

 In other words, where an offeree communicates an ambiguous acceptance, the offeree

must assume the risk of the offeror's misinterpretation.  *See Russell*, 569 N.Y.S.2d at 414.  This

makes good-sense as a matter of contract law.  It is merely a more specific iteration of the

traditional principle that ambiguity is construed against the party who issued the

communication—a principle that encourages parties to transaction to be as clear as possible.  *See*

*Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) ("[A]mbiguous

language should be construed against the interest of the drafting party."); *R.G. Group, Inc.*, 751

F.2d at 75 ("It is important to commerce that the law make clear what force will be given to

various expressions of intent . . . .").

## 2.

Here, Mr. Johnson's conduct—at least until he later refused forthrightly to re-sign a new

non-competition agreement—was ambiguous.  He signed the non-competition agreement on the

signature block designated for IBM and submitted it without disclosing to IBM executives—at

first[10]—his intent.  Because of his ambiguous conduct, Mr. Johnson assumed the risk of IBM's

misunderstanding, and therefore IBM's reaction to Mr. Johnson's conduct controls whether it

entered into a contractual relationship with him.

From IBM's conduct following its receipt of Mr. Johnson's improperly signed non-

competition agreement, it is evident that there are, at the very least, significant doubts as to

whether it believed that Mr. Johnson had accepted its offer.  After IBM's receipt of Mr.

Johnson's improperly signed agreement, IBM failed to sign—and, indeed, returned to him—the

original copy of the agreement, in contravention of its internal protocols for booking validly

executed non-competition agreements.  Concurrently, IBM asked Mr. Johnson to re-sign a new

copy of the non-competition agreement on the proper signature line—essentially, asking him to

clarify his intentions.  Mr. Johnson then unambiguously stated his intention—he refused to sign

the agreement in the appropriate space, as is memorialized by Cannone's handwritten note on a

printed e-mail exchange between Staff Counsel (Wood) and Brickmeier.  Def. Exh. 1 at 1.

---

[10]  As discussed in more detail below, Mr. Johnson disclosed to Don Rosenberg, IBM's General Counsel,
his intent in signing the non-competition agreement on the signature block designated for IBM.

At no point did IBM take any actions, concurrent with its requests that Mr. Johnson re-sign the agreement, suggesting that it believed that Mr. Johnson had accepted its offer to enter into a non-competition agreement or that obtaining a properly signed agreement was simply a clerical issue.[11]  In fact, on July 28, 2006, Donna Riley, IBM's Vice President of Human Resources, explicitly told Mr. Johnson that the Company did not consider his ambiguous conduct an acceptance.  In an e-mail to Mr. Johnson, Riley acknowledged that she was being a "pest," presumably by repeatedly contacting Mr. Johnson regarding the non-competition agreement, and explained that Mr. Johnson's agreement "isn't booked since the original was signed in the wrong place."  Def. Exh. 4 at 1.  Riley then threatened Mr. Johnson, indicating that he would be receiving a call from MacDonald regarding the status of his equity grants.  Such a threat, and IBM's acknowledge that it had not "booked" the agreement, certainly is not suggestive of a belief on IBM's behalf that Mr. Johnson had accepted its offer.

Mr. Johnson also testified that he discussed his improper signature of the non-competition agreement with Don Rosenberg, IBM's General Counsel.  During this meeting, Mr. Johnson told Rosenberg that he purposefully had signed on the wrong line and that he thought that meant that the agreement was not binding.  According to Mr. Johnson, Rosenberg explained to Mr. Johnson that that was not necessarily the case.  Mr. Johnson then told Rosenberg that IBM employees had pursued him to sign another version of the agreement.  Rosenberg's eyebrows went up—a signal that, according to Mr. Johnson, conveyed the meaning that Rosenberg did not believe that the agreement was binding—and he (Rosenberg) told Mr. Johnson to "save the documentation to demonstrate that there had been repeated efforts where [Mr. Johnson] didn't

---

[11]  Brickmeier testified that "[a]t some point in 2006, we decided to stop asking Mr. Johnson to re-execute his existing non-compete because he had already signed the agreement, and the placement of his signature was just a minor record-keeping issue."  Declaration of Barbara Brickmeier ("Brickmeier Decl.") ¶ 20.  In the limited record currently before the Court, however, there is little documentary support for this testimony, and, in fact, IBM's conduct throughout all of 2006 belies this position.

respond." Prelim. Inj. Hr'g Tr. 28-31.  The Court considers it significant that IBM presented no

evidence suggesting that this meeting with IBM's General Counsel did not occur or casting

doubt on Mr. Johnson's interpretation of Rosenberg's communications.

IBM's payment of equity awards to Mr. Johnson in 2005 and 2006 also does not suggest

that it believed that Mr. Johnson had accepted the non-competition agreement.  First, IBM's

payment of these awards was not concurrent with Mr. Johnson's signing of the non-compete.  In

2005, Mr. Johnson received the award two months before the non-competition agreement was

even due.  In 2006, he received the award nearly a year after he had improperly signed the non-

competition agreement and within weeks of the date of the e-mail from Staff Counsel to the

Human Resources Law Group, which contained a handwritten note that Mr. Johnson had refused

to sign a new copy of the agreement.  Second, MacDonald testified that he had the discretion to

permit the awards despite an employee's failure to sign a non-competition agreement.  *See*

Prelim. Inj. Hr'g Tr. 56.  Third, IBM's 2001 LTIP contained a provision allowing IBM to claw-

back certain portions of the equity awards if Mr. Johnson accepted employment with a

competitor, and this claw-back provision operated independently of any non-competition

agreement.  Def. Exh. 33 pg. 10 ¶ 13.

IBM also argues that, even if there was no express contract created between it and Mr.

Johnson, Mr. Johnson nevertheless should be equitably estopped from denying the validity of the

agreement.  It contends that Mr. Johnson's conduct suggests that he specifically intended to

mislead IBM into believing that he had accepted his agreement by the deadline.  Although Mr.

Johnson certainly was too clever by half, his goal was not to mislead IBM into believing that he

had assented to the non-competition agreement, but rather to extend the time that he would have

to enter into such an agreement.  He was counting on IBM realizing that by improperly signing

the agreement he had not assented to its terms.  Moreover, having presided over the live, in-court cross- and re-direct examination of Mr. Johnson, this Court believes that he was an extremely credible and reasonable witness.[12]

Indeed, the equities in this case go both ways.  According to Mr. Johnson, IBM's conduct, prior to this lawsuit, consistently suggested to him that IBM did not believe that it and Mr. Johnson had a valid non-competition agreement, yet IBM has now changed its position and seeks to enforce the agreement.  Furthermore, Mr. Johnson has submitted evidence suggesting that IBM misled him into believing that he would be considered for a General Manger position, while at the same time it attempted to obtain a one-year non-competition agreement from him.

In short, IBM faces a daunting, if not insurmountable, task in convincing a finder-of-fact that it treated Mr. Johnson's ambiguous conduct as an acceptance of its offer to enter into a non-competition agreement.  Consequently, the Court cannot find, based on the limited record before it, that IBM has established a likelihood of success on the merits of its breach of contract claim. *Moore v. Consol. Edison Co.*, 409 F.3d 506, 510 (2d Cir. 2005).

## C.  The Balance of Equities

Although IBM has not carried its burden of establishing a likelihood of success on the merits, it has an alternative avenue of relief under Second Circuit jurisprudence.  The Second Circuit has held that a party may obtain injunctive relief if it shows that (1) there are "questions so serious, substantial, difficult, and doubtful as to make them fair ground for litigation and thus more deliberate investigation"; and (2) the harm that it would suffer is "'decidedly' greater" than

---

[12]  In contrast, the Court found much less persuasive MacDonald's testimony because, despite being IBM's designee under Rule 30(b)(6) to discuss matters related to Mr. Johnson's signing of the non-competition agreement, MacDonald had not been shown or reviewed all the documents in IBM's possession, particularly those supporting Mr. Johnson's position. *See supra* note 2.  Rule 30(b)(6) clearly states that the person "designated must testify about information known or reasonably available to the organization."  The Court finds it troubling that MacDonald was proffered as IBM's Rule 30(b)(6) witness without being provided with enough information to fulfill that mandate.

the harm that its adversary would suffer.  *Buffalo Forge Co.*, 638 F.2d at 569 (quoting *Buffalo Courier-Express, Inc.*, 601 F.2d at 58); *Fed. Express Corp.*, 201 F.3d at 173 (wording the first prong of the test as "sufficiently serious questions going to the merits to make them a fair ground for litigation").  In the Court's view there is little question that IBM has shown that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and therefore the Court shall confine its discussion to a balancing of hardships.

### 1.

In *Buffalo Courier-Express*, the Second Circuit explained that "'[a] balance of hardships tipping decidedly toward the party requesting preliminary relief' must mean real hardship from the denial of relief Pendente lite not merely the showing of difficulty of measurement which may suffice to constitute 'irreparable damage' where a plaintiff shows probable success."  601 F.2d at 58.  In vacating the preliminary injunction issued by the district court, the Second Circuit in *Buffalo Courier* noted:  "There can be no doubt that if the [applicant] had shown a significant possibility that it would be driven out of business by the [opposing party] in the period before a trial could be held, the *Hamilton-Benrus* test would have been amply passed."  *Id.* (citing *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 743 (2d Cir. 1953); *Hamilton Watch Co. v. Benrus Watch Co.*, 114 F. Supp. 307, 311, 313-14 (D. Conn. 1953); and *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970)).

*Hamilton* and *Semmes* both presented the risk of dramatic hardship.[13]  Later, in *Nemer Jeep-Eagle Inc. v. Jeep Eagle Sales Corp.*, the Second Circuit explained that it did not read the foregoing cases "so narrowly."  992 F.2d 430, 435-36 (2d Cir. 1993).  The court included within the ambit of the *Hamilton* test "*[m]ajor disruption* of a business" and a '*threat* to the continued existence of a business.'"  *Id.* (first emphasis in original) (quoting *John B. Hull, Inc. v. Waterbury Petrol. Prods., Inc.*, 588 F.2d 24, 28-29 (2d Cir. 1978)); *see also American Airlines v. Imhof*, --- F. Supp. 2d --- , No. 09 Civ. 4535, 2009 WL 1531098, at *9 (S.D.N.Y. June 3, 2009).  The Court also is mindful that "[i]f the element of irreparable damage is prerequisite for relief where the plaintiff must show probable success on the merits, then a fortiori where the plaintiff establishes something less than probable success on the merits, need for proof of the threat of irreparable damage is even more pronounced."  *Triebwasser & Katz v. American Tel. & Tel. Co.*, 535 F.2d 1356, 1359 (2d Cir. 1976).

The Court pauses to note that at least one authority has read the Supreme Court's recent decision in *Winter v. National Resources Defense Council*, --- U.S. --- , 129 S. Ct. 365, 374 (2008), as casting doubt on Second Circuit case law allowing parties who cannot show a likelihood of success to obtain an injunction if they show that there are "questions so serious, substantial, difficult, and doubtful as to make them fair ground for litigation."  13 James Wm. Moore et al., Moore's Federal Practice § 65.22[5][c] (3d ed. 2009) ("In light of Supreme Court precedent, the Second Circuit's references to 'sufficiently serious questions going to the merits of the claim,' *should not* be read to authorize preliminary injunctions in the absence of a

---

[13]  In *Hamilton*, the denial of an injunctive order would have brought the movant under the control of a direct competitor, which may have led to drastically reduced competition in the market.  206 F.2d at 743-44.  Similarly, in *Semmes Motors, Inc.*, the Second Circuit concluded that the balance of hardships tipped decidedly in favor of the movant where it had demonstrated that, without an injunctive order, it would have been forced out of business as a Ford distributor.  429 F.2d at 1205; *see also Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 126 (2d Cir. 1984) (holding that the potential loss of the plaintiff's distributorship in the absence of an injunctive order decidedly tipped the equities in the plaintiff's favor).

showing that the party seeking the injunction is *likely* to succeed on the merits; a *possibility* of success is insufficient." (citing *Winter*, 129 S. Ct. at 374)) (first emphasis supplied) (footnote omitted).[14]  In *Winter*, the Supreme Court explained that "[a] plaintiff seeking a preliminary injunction *must* establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." 129 S. Ct. at 374 (emphasis supplied).  Because the Court determines that IBM has not satisfied the Second Circuit's alternative avenue for obtaining a preliminary injunction, it is not necessary for the Court to address this apparent tension.

## 2.

In balancing the hardship as between the parties, the Court begins with a discussion of the harm that IBM would suffer absent an injunctive order.  The real or inevitable disclosure of trade secret information is sufficient to establish a real risk of irreparable harm.  *Int'l Bus. Mach. Corp. v. Papermaster*, No. 08-cv-9078, 2008 WL 4974508, at *10 (S.D.N.Y. Nov. 21, 2008).  Under New York law, a trade secret is defined as "any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) (internal quotation marks and citation omitted) (alteration in original).[15]

---

[14] *See also* MOORE ET AL., *supra*, § 65.22[5][b] ("Confusion has also resulted from the suggestion that the threat of irreparable harm must be greater under the second prong of the test than under the first.  The Supreme Court has clarified this matter by stating that the party seeking injunctive relief must establish a *likelihood* of success on the merits and that irreparable injury is *likely* in the absence of an injunction; a possibility of either is insufficient.").

[15] Specifically, courts look to the following factors to determine whether information constitutes a trade secret:  (1) the extent to which the information is known outside of the business; (2) the extent to which it is known

IBM would undoubtedly suffer harm absent an injunctive order.  According to IBM, Mr. Johnson is aware of IBM's past, present, and future business strategies as well as the acquisitions, transactions, and divestitures that IBM is considering.  Because of his work as head of IBM's Corporate Development group, Mr. Johnson knows IBM's strategies for growth, and its method of evaluating future business needs and companies as candidates for acquisition.  In addition, IBM contends that Mr. Johnson is aware of its assessment of its clients' needs, its competitors' strategies, its opportunities, and its strategies for carrying out its business objectives.  Mr. Johnson knows in which areas, companies, and technologies IBM will invest, at what times, and with what expected rates of return.  Mr. Johnson, in short, has inside strategic business information about IBM, and disclosure of that information would harm the Company.

The Court nevertheless believes that IBM has overstated its case.  Mr. Johnson does not have the sort of information that is considered quintessential trade secret information—detailed technical know-how, formulae, designs, or procedures.  *See American Airlines*, 2009 WL 1531098, at *6 ("[I]t is well to bear in mind that we are dealing with an individual responsible for sales of a widely used service as distinct, for example, from a food chemist privy to the secret formula for Coca-Cola or even a salesman for a highly specialized, technical product used only by small numbers of obscure manufacturers.").  At issue in *IBM v. Papermaster*, for example, was an employee who had "worked for years with some of the crown jewels of IBM's technology" and who had "been inculcated with" technical knowledge regarding "the development of cutting-edge microprocessors that have application across the full spectrum of electronics products."  *Papermaster*, 2008 WL 4974508, at * 8.  What is more, IBM's

---

by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated.  *See N. Atl. Instruments, Inc.*, 188 F.3d at 44.

submissions regarding Mr. Johnson's knowledge of its technological information is long on

generalities and rather short on details.[16]  This makes it extraordinarily difficult to determine

whether and, if so, how much of, the information that Mr. Johnson possesses is public and

readily available to its competition.  *See Sci. Components Corp. v. Sirenza Microdevices, Inc.*,

No. 03-CV-1851, 2006 WL 2524187, at *28 (S.D.N.Y. Aug. 30, 2006) ("[B]y definition,

information that is publicly available is not secret.").  Also left unclear are details regarding how

many potential acquisitions and divestitures were in the "pipeline," as it were, when Mr. Johnson

resigned, how large and critical those potential transactions are to IBM and/or Dell, or what other

market players are potentially aware of such transaction.  *Cf.* Amended Affidavit of David L.

Johnson ("Johnson Am. Aff.") ¶ 30 ("Upon my retirement from IBM, the 'pipeline' of potential

acquisitions was unusually short.  Thus, I have limited knowledge regarding transactions that

IBM is currently considering.").  Even so, the Court concludes that IBM would suffer harm

absent an injunctive order, and the Court turns to the hardship that Mr. Johnson would suffer.

    The Court believes that forcing Mr. Johnson, a 55-year old man who is at the peak of his

career, to abstain from plying his trade for a year would cause him not insubstantial harm.  Due

to the nature of his qualifications and skills, Mr. Johnson must deal with information that

changes rapidly and requires constant attention.  Indeed, given that Mr. Johnson does not have

detailed technical know-how regarding technology products, his ability to stay *au courant* with

---

[16]  For instance, IBM contends that Mr. Johnson possesses a "deep knowledge of virtually all of IBM's technological innovations and initiatives," and it then provides a laundry list of technological products that IBM sells.  Supplemental Declaration of Mark Loughridge ("Loughridge Supp. Decl.") ¶ 15.  Notably absent, however, is any indication of what specific details Mr. Johnson possesses about these products or product areas or how much technical detail his mergers and acquisitions work for IBM required him to know.  *See American Airlines*, 2009 WL 1531098, at *7 ("[T]hese claims are generalities, easily voiced and, to a great degree, devoid of real content.").  Indeed, Mr. Johnson disputes IBM's claims.  As a member of the IVT, Mr. Johnson contends that he attended only thirteen meetings between 1996 and January 2009, and he does not recall any IVT meeting focusing on IBM's competitors, development plans for unannounced products, or trade secret information regarding hardware, software, or services.  Mr. Johnson also explains that he never attended the meetings of the Technology Committee, which is the forum for internal discussions about IBM's research and development.

industry rumors and developments is fundamental.  Without monitoring the external factors that guide and mold the technology industry—through access to daily contact with insiders, reports, surveys, and analyses conducted industry-wide—Mr. Johnson's skill set might well become obsolete.  Moreover, Mr. Johnson has developed a large personal network of investment bankers, consulting groups, and chief information officers with whom he risks losing touch without a formal position in the technology industry.  Although IBM notes that Dell is willing to pay Mr. Johnson quite handsomely during the one-year non-compete term, there is no guarantee that Dell will continue to employ Mr. Johnson, who was hired by Dell as an at-will employee, if he is forced to sit on the sidelines of the ever changing and evolving technology industry.  *See* Pl. Exh. 73 at 4-5.  The damage to Mr. Johnson's career and the risk that he will be sentenced to an early retirement, especially during these volatile economic times, cannot be underestimated.

New York's public policy, which "strong[ly] disfavor[s] . . . non-competition covenants in employment contracts," is another factor in determining that the balance of equities here does not tip decidedly in favor of IBM.[17]  *Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1099 (2d Cir. 1992).  "Undoubtedly judicial disfavor of these covenants," the Court of Appeals of New York has written, "is provoked by powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood."  *Reed, Roberts Assocs., Inc. v. Strauman*, 353 N.E.2d 590, 593 (N.Y. 1976) ("Indeed, our economy is premised on the competition engendered by the uninhibited flow of services, talent and ideas."); *see also McKay v. Communispond, Inc.*, 581 F. Supp. 801, 806 (S.D.N.Y. 1983).

---

[17]  The Second Circuit has explained that although its "settled preliminary injunction standard does not explicitly mention the public interest, as do other Circuit's standards, we have recognized that, as a court of equity, we 'may go much further both to give or to withhold relief in furtherance of the public interest than where only private interests are involved.'"  *Standard & Poor's Corp., Inc. v. Commodity Exch., Inc.*, 683 F.2d 704, 711 (2d Cir. 1982) (quoting *Brown & Williamson Tobacco Corp. v. Engman*, 527 F.2d 1115, 1121 (2d Cir. 1975)); *Winter*, 129 S. Ct. at 374.

In sum, given IBM's failure to show a likelihood of success on the merits, the significant hardship that Mr. Johnson would suffer from the issuance of an injunctive order, and New York's public policy disfavoring non-competition agreements, this Court cannot find that the balance of equities tips "decidedly" in favor of IBM.

## Conclusion

Following its receipt of Mr. Johnson's improperly executed agreement, IBM's actions raise significant doubts as to whether it believed that Mr. Johnson had accepted its offer to enter into a non-competition agreement.  After receiving the improperly signed agreement, IBM failed to sign—and, indeed, returned—the original copy of the agreement, in contravention of its internal protocols for booking validly signed non-competition agreements.  IBM asked Mr. Johnson to re-sign a new copy of the agreement on the proper signature line—essentially, asking him to clarify his intentions—and he refused.   A senior IBM executive then told Mr. Johnson that IBM had not "booked" his agreement because "the original was signed in the wrong place." Def. Exh. 4 at 1.  Rosenberg, IBM's General Counsel, also suggested to Mr. Johnson that IBM did not consider his improperly signed agreement to be an acceptance of the Company's offer. Accordingly, the Court cannot find, based on the limited record before it, that IBM has established a likelihood of success on the merits of its breach of contract claim.  *See Moore*, 409 F.3d at 510.

Although this case presents "questions so serious, substantial, difficult, and doubtful as to make them fair ground for litigation and thus more deliberate investigation," *see Buffalo Forge Co.*, 638 F.2d at 569, the Court cannot grant IBM's request for a preliminary injunction.  After balancing the hardship that would result from the erroneous grant or denial of a preliminary

09 Civ. 4826 (SCR)                                                                        27

injunction, the Court concludes, based on the record before it, that IBM would indeed suffer

some harm, but assuredly that harm is not "decidedly greater" than the harm that would befall

Mr. Johnson. *See Semmes Motors, Inc.*, 429 F.2d at 1205; *American Airlines*, 2009 WL

1531098, at *9.

Consequently, the Court denies IBM's motion for a preliminary injunction, and Judge

Karas' Order June 4, 2009, along with this Court's extension of that Order, is vacated. The

parties are directed to submit a proposed Rule 16 scheduling order.

*It is so ordered.*

Dated: June 26 , 2009

White Plains, New York

Stephen C. Robinson
United States District Judge